787 F.2d 875
 54 USLW 2515, 33 Cont.Cas.Fed. (CCH) 74,321
 AMERON, INC.
and
United States Senate, Intervenor,
Thomas P. O'Neill, Speaker of House of Representatives and
Bipartisan Leadership Group, Intervenors, Appellees,
v.
U.S. ARMY CORPS OF ENGINEERS; Lt. Col. Michael K.
Collmeyer, Contracting Officer, United States of
America; and Spiniello Construction Company.
Appeal of UNITED STATES of America.
 Nos. 85-5226, 85-5377.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 29, 1985.
Decided March 27, 1986.
As Amended April 4, 1986.
 
 Richard K. Willard, Asst. Atty. Gen. (argued), W. Hunt Dumont, U.S. Atty., Paul Blankenstein, U.S. Dept. of Justice, Appellate Staff, Civ. Div., Washington, D.C., for appellant U.S.
 Edward G. D'Alessandro, D'Alessandro, Sussman, Jacovino & Mahoney, Florham Park, N.J., for appellant Spiniello Const. Co.
 Michael Davidson, Senate Legal Counsel (argued), Ken U. Benjamin, Jr., Deputy Senate Legal Counsel, Morgan J. Frankel, Asst. Senate Legal Counsel, Washington, D.C., for appellee U.S. Senate.
 Theodore I. Botter (argued), Meyner & Landis, Newark, N.J., for appellee Ameron, Inc.
 Steven R. Ross, Gen. Counsel to the Clerk, Charles Tiefer, Deputy General Counsel to the Clerk (argued), Michael L. Murray, Assistant Counsel to the Clerk, U.S. House of Representatives, Washington, D.C., for intervenors-appellees Speaker and Bipartisan Leadership Group.
 David S. Cohen, Sharon R. Gross, Cohen & White, Washington, D.C., for amicus curiae Computer & Communications Industry Assn.
 Harry R. Van Cleve, Gen. Counsel, Seymour Efros, Associate Gen. Counsel, Robert P. Murphy, Atty. (argued), U.S. Gen. Accounting Office, Washington, D.C., for amicus curiae The Comptroller General of the U.S.
 Before GARTH, and BECKER, Circuit Judges, and HUYETT, District judge.*
 OPINION OF THE COURT
 GARTH, Circuit Judge:
 
 
 1
 This appeal presents, in a rather prosaic setting, a problem of profound constitutional significance concerning the division of power among the three branches of our federal government. At issue is the constitutionality of the automatic stay provisions of the Competition in Contracting Act (CICA), Pub.L. No. 98-369, Subtitle D, 98 Stat. 1199-1201, codified at 31 U.S.C.A. Sec. 3553 et seq. (West Supp.1985). The United States Army Corps of Engineers and the other executive department defendants [hereinafter referred to collectively as the Army] appeal from a decision of the district court declaring the CICA stay provisions to be constitutional and ordering broad injunctive relief to plaintiff Ameron and the Congressional intervenors.
 
 
 2
 We now affirm the district court's holding that the Comptroller General, as head of the General Accounting Office, is an independent official with duties involving both the legislative and executive branches of the United States government. As such, he may constitutionally exercise the powers conferred upon him by CICA. We also conclude, however, that the injunction granted by the district court was broader than necessary to grant the full relief to which plaintiffs were entitled, and therefore modify the injunction as specified below.
 
 I.
 A.
 
 3
 Congress created the General Accounting Office (GAO) and the Office of the Comptroller General by the Budget and Accounting Act of 1921, Pub.L. No. 13, Sec. 301, 42 Stat. 20, 23. The 1921 Act was the culmination of Congressional efforts over many years to provide accountability for the federal government's finances. The original Comptroller of the Treasury was an executive officer within the Treasury Department. 1 Stat. 65-66 (1789). The Comptroller continued as an executive officer with executive functions under subsequent enactments. See, e.g., Act of March 3, 1817, 3 Stat. 366; Dockery Act of 1894, 28 Stat. 162, 205.
 
 
 4
 When they were created to replace the Comptroller of Treasury, the GAO and the Comptroller General were initially empowered to report to Congress and assist Congress in the budget process. 1921 Act, Secs. 304-312, 42 Stat. 23-26. Even in 1921, however, the Comptroller General, even though created in part to assist Congress, was assigned duties that were not traditionally "legislative": auditing and settling public accounts, countersigning treasury warrants, prescribing "the forms of keeping and rendering all public accounts"--these and other executive duties were given to the GAO and the Comptroller General by the 1921 Act, which also abolished the Comptroller of the Treasury. Secs. 301, 304, 310. The parties do not dispute that the Comptroller General continues to perform significant duties that are both "legislative" and "non-legislative," i.e., executive, in nature.
 
 
 5
 As an adjunct of its account-settling role, the Comptroller General over the years began to hear protests from disappointed bidders on government contracts. See Wheelabrator Corp. v. Chafee, 455 F.2d 1306, 1313 (D.C.Cir.1971). This role was formalized by the Competition in Contracting Act (CICA) in 1984. 31 U.S.C.A. Secs. 3551-3556 (West Supp.1985). CICA was enacted to remedy a major loophole in the long-standing GAO review procedure: by the time the GAO reviewed most bid protests, the protests had become moot because either the contract had been let or the contractor was engaged in performing under the contract. While GAO regulations provided for a stay of either the granting or performance of the contract in some circumstances, see Merriam v. Kunzig, 476 F.2d 1233, 1236 & n. 1 (3d Cir.1973), this stay was easily overridden by the contracting agency involved. The result was that most procurements became faits accomplis before they could be reviewed. This situation was identified by Congress as a contributing factor to the crisis of waste in federal procurement. In particular, Congress recognized as a problem that of $168 billion in government contracts awarded in fiscal year 1983, only about one-third, $54 billion, was awarded on a competitive basis. Competition in Contracting Act of 1984: H.R.Rep. No. 1157, 98th Cong., 2d Sess. 12 (1984). In enacting CICA, Congress attempted to provide effective review of bid challenges, and in the process to encourage competition in contracting. See Opinion of District Court, 607 F.Supp. 962, 973-74 (D.N.J.1985).
 
 
 6
 In relevant part, CICA permits a potential or actual bidder who disputes the terms or awarding of a government contract to challenge the procurement or the award of the contract by filing a protest with the Comptroller General. Upon receiving the protest, the Comptroller General must "within one working day" notify the agency involved, which must then make a report on the challenged contract. 31 U.S.C. Sec. 3553(b)(1).
 
 
 7
 The filing of a protest freezes, or stays, the awarding of the contract or any action under it until either the Comptroller General makes a decision on the protest or the agency head certifies in writing that "urgent and compelling circumstances which significantly affect interests of the United States" require that the contract be awarded, 31 U.S.C. Sec. 3553(c)(2), or that "the best interests of the United States" require that performance proceed under a contract already awarded by the agency. 31 U.S.C. Sec. 3553(d)(2).
 
 
 8
 The Act requires the Comptroller General to issue a final decision on the protest within 90 working days unless he determines in writing that the circumstances of the protest require more time. 31 U.S.C. Sec. 3554(a)(1). The Comptroller General may also exercise an "express option" to expedite review of certain cases within 45 calendar days, 31 U.S.C. Sec. 3554(a)(2), and may dismiss patently frivolous or meritless claims on a summary basis. 31 U.S.C. Sec. 3554(a)(3).
 
 
 9
 The power of the Comptroller General in rendering his decision is limited to a recommendation that the agency, inter alia, terminate or rebid the contract, issue a new solicitation, refrain from exercising options under a contract, or award a different contract consistent with law. 31 U.S.C. Sec. 3554(b)(1). The only affirmative power provided to the Comptroller General is to award a prevailing protester its bid and proposal preparation costs, as well as its costs and attorneys' fees in filing and pursuing the bid protest. 31 U.S.C. Sec. 3554(c)(1).
 
 
 10
 President Reagan signed CICA into law as part of the omnibus Deficit Reduction Act of 1984, but he declared the automatic stay provision unconstitutional upon the advice of the Attorney General and ordered the executive department not to observe it. Accordingly, the Office of Management and Budget issued instructions to executive agencies to proceed with the procurement process "as though no such [stay] provisions were contained in the act." OMB Bulletin No. 85-8 at 2 (Dec. 17, 1984).
 
 B.
 
 11
 The mundane facts underlying the present controversy belie the compelling nature of the constitutional question before us. In late 1984, Ameron submitted a bid on a proposed contract to clean and repair sewer lines at West Point, New York. The Army's "Invitation for Bids" required an interested party to submit along with its bid a bond guaranteeing 20 percent of the bid amount. When the sealed bids were opened, Ameron was the apparent low bidder with an offer of $1,033,000, about $200,000 less than the next lowest bidder, defendant Spiniello Construction Company. However, Ameron's bid was rejected because the dollar amount of the bond had been altered without any indication that the surety had agreed to be bound by the change. Although Ameron contended that the change was merely the result of a typist's error,[1] the agency rejected Ameron's bid as non-responsive to the terms of the invitation and awarded the contract to Spiniello. See Affidavit of Michael K. Collinger at 1-2.
 
 
 12
 On March 1, 1985, within ten days of the awarding of the contract, Ameron filed a protest with the Comptroller General, claiming that the Army had wrongfully rejected its bid. Three days later, Ameron filed suit in federal district court claiming that the Army had arbitrarily rejected its bid and seeking a preliminary injunction to restrain the Army and the victorious bidder from proceeding with the contract pending the outcome of Ameron's protest to the Comptroller General. Ameron also sought a temporary restraining order enjoining performance of the contract.
 
 
 13
 The district court first denied the request for a temporary restraining order, and then granted it on March 7, 1985 when the stay provisions of 31 U.S.C. Sec. 3553(d)(1) were brought to its attention, pending a hearing on the preliminary injunction to be held March 18, 1985. After hearing argument on March 18 and granting the motion of the Senate, the Speaker, and the Bipartisan Leadership Group of the House to intervene as plaintiffs to support the constitutionality of CICA, the district court eventually granted the preliminary injunction on March 27, 1985. 607 F.Supp. 962 (D.N.J.1985).
 
 
 14
 In an oral opinion delivered from the bench, the court rejected Ameron's claim that the Army had acted arbitrarily. That ruling is not before us on appeal. The court concluded, however, that Ameron was entitled to a preliminary injunction enforcing a stay because the CICA stay provision was constitutional. The court held that Congress could delegate the non-legislative power to lift the stay to the Comptroller General because he was appointed by the President in accordance with the Appointments Clause of the Constitution, Art. II Sec. 2, C 1.2, and therefore was not merely an agent of Congress. Id. at 971-74. The Army filed a timely notice of appeal from the injunction ruling. A month later, on April 29, 1985, the Comptroller General issued a decision denying Ameron's protest on the merits.[2] The parties agreed that this did not render the case moot, and proceeded to file cross-motions for summary judgment.
 
 
 15
 The court thereafter denied Ameron's motion for summary judgment on the merits of its bid protest, but granted the motion of the intervenors for a permanent injunction ordering the federal government to comply with and implement 31 U.S.C. Sec. 3553. 610 F.Supp. 750 (D.N.J.1985). We reproduce the full text of the court's order in the appendix.
 
 
 16
 The court also declared 31 U.S.C. Sec. 3553 to be constitutional, and joined OMB Director David Stockman and Defense Secretary Casper Weinberger as necessary defendants. Although the injunction contains no language limiting its application to less than the entire federal government, it is apparent from the court's oral opinion that it intended its order to have controlling effect only within the District of New Jersey. See id. at 756. The Army appealed again, and the appeals (Nos. 85-5226, 85-5377) were consolidated for review by this court.
 
 II.
 
 17
 At the outset, we must determine if this case was rendered moot by the disposition of Ameron's original bid protest by the Comptroller General. Although the Comptroller General's decision lifted the stay provided by CICA, arguably obviating the need for an injunction, it is urged that this case is not moot. Even when no more relief may be granted to a plaintiff, a case may continue to decision and remain viable on appeal if the problem presented is "capable of repetition yet evading review." See In re Kulp Foundry, 691 F.2d 1125, 1128-29 (3d Cir.1982). This standard applies if 1) the problem allegedly causing injury is resolved within too short a time period to ever be fully litigated and appealed, and 2) the party seeking relief is likely to be subject to the same injury in the future. Murphy v. Hunt, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982). See also Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973).
 
 
 18
 The parties agree that this case is an appropriate one for application of the rule, and we concur. A bid protest will usually be resolved within 90 days, so that by the time a case can be appealed to this court, it will almost always face the prospect of being regarded as moot. Moreover, Ameron, as a company frequently seeking government contracts, represented that it is likely to be faced with a similar situation again: desiring to protest a contract decision but being unable to obtain the statutorily guaranteed stay while its protest is being reviewed. Lest the issue presented evade review, we hold that the present dispute is not moot, and we proceed to consider this case on the merits.
 
 III.
 
 19
 As the Supreme Court observed in Buckley v. Valeo, 424 U.S. 1, 124, 96 S.Ct. 612, 684, 46 L.Ed.2d 659 (1976), "The principle of separation of powers was not simply an abstract generalization in the minds of the Framers: it was woven into the document that they drafted in Philadelphia in the Summer of 1787." The Constitution creates three distinct branches of government and vests specific powers in each. This design is intended to block tyranny by any one branch by providing a series of checks and balances to diffuse concentrations of power. "The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted." INS v. Chadha, 462 U.S. 919, 951, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983).
 
 
 20
 Nevertheless, the Court has rejected any notion that the branches are hermetically sealed. "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon the branches separateness but interdependence, autonomy but reciprocity." Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). See Buckley, 424 U.S. at 121, 96 S.Ct. at 683. Moreover, this court has recently emphasized that separation of powers analysis must focus pragmatically on whether the challenged provision actually or potentially interferes with the ability of the affected branch to accomplish its constitutionally assigned functions. In re The President's Commission on Organized Crime Subpoena of Nicodemo Scarfo, 783 F.2d 370, 375 (3d Cir.1986). See also Nixon v. Administrator of General Services, 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977).
 
 
 21
 In applying the separation of powers principle, which is not explicitly mentioned in the Constitution but which undergirds the Constitutional philosophy, the Court has more than once felt compelled to rein in one or another branch of government. The Court has held that Congress, as the legislative branch, may not delegate to itself or its agents executive or judicial power, Hampton & Co. v. United States, 276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624 (1928); that the executive may not exercise legislative power belonging only to Congress, Youngstown; and that executive and administrative duties of a non-judicial nature may not be imposed upon Article III judges. United States v. Ferreira, 54 U.S. (13 How.) 40, 50-51, 14 L.Ed. 42 (1852). See generally President's Commission (Scarfo), supra.
 
 
 22
 Moreover, the power of appointment and removal must be exercised in conformity with the separation of powers. Congress may not curtail the power of the President to remove purely executive officials, Myers v. United States, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926), but may create agencies which exercise mixed duties whose members may be protected from removal by the executive without cause. Humphrey's Executor v. United States, 295 U.S. 602, 629, 55 S.Ct. 869, 874, 79 L.Ed. 1611 (1935). Congress may not, however, retain for itself the power to appoint officials of the government who exercise executive power. Buckley, 424 U.S. at 126, 96 S.Ct. at 685.
 
 
 23
 While disputing the application of these rules to the case at hand, the parties do appear to agree on one point: the key issue in this case is the characterization of the Office of the Comptroller General. If the Comptroller General, as the Army argues, is deemed to be an agent of Congress, then his possession of executive powers and duties is arguably unconstitutional. On the other hand, if he is an executive agent, then the performance of executive duties by the Comptroller would arguably create no constitutional problem.
 
 
 24
 The only other court that has addressed the question whether the Comptroller General may constitutionally exercise the powers granted under CICA concluded, following the reasoning of the district court in the present case, that the Comptroller could constitutionally exercise mixed powers. See Lear Siegler, Inc. v. Lehman, No. CV 85-1125-KN, slip op. at 7-11 (C.D.Cal. Nov. 21, 1985).
 
 
 25
 In a recent decision, a three-judge panel in the United States District Court for the District of Columbia[3] held that certain provisions of the Balanced Budget and Emergency Deficit Control Act of 1985, popularly known as the Gramm-Rudman-Hollings Act, were unconstitutional because they vested executive powers in the Comptroller General. Synar v. United States, 626 F.Supp. 1374 (D.D.C.1986). Under the Synar analysis, the Comptroller General was not permitted to exercise these powers under the Constitution. The court did not reach a firm conclusion regarding the characterization of the Comptroller General as an agent or member of a particular branch of the government, but concluded that executive power to mandate budget cuts could not be delegated to "an officer removable by Congress." Id., at 1402.
 
 
 26
 In resolving the central question of characterization as it is presented on this appeal, we confront plausible arguments on both sides. Several factors weigh in favor of considering the Comptroller General to be an executive officer. Foremost among these factors is that the Comptroller General exercises significant executive functions in managing the accounts of the federal government and is appointed by the President--factors which, in and of themselves, arguably render the Comptroller an "Officer of the United States" under Buckley, 424 U.S. at 126, 96 S.Ct. at 685. The historic roots of the Comptroller's functions in the Treasury Department also militate against finding that the Comptroller is merely a legislative agent.
 
 
 27
 Against these factors, the Army marshals a great welter of dicta and conclusory statements to the effect that the Comptroller General is not an executive officer but rather an agent or member of the legislative branch. Several courts, first of all, have stated without extensive analysis that the GAO is an arm of the Congress. See, e.g., McDonnell Douglas Corp. v. United States, 754 F.2d 365, 368 (Fed.Cir.1985); United States v. McDonnell Douglas Corp., 751 F.2d 220, 224 (8th Cir.1984); M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1305 (D.C.Cir.1971). The Army also cites to numerous points in the legislative history of the 1921 Act and in other statutes where the GAO is characterized or labelled as a "legislative" agency. See, e.g., 61 Cong.Rec. 1080 (Comptroller General "is to be the arm of the Congress": Rep. Good); id. at 1081 (Comptroller General is "representative of Congress" unlike Director of the Bureau of the Budget "who serves the President and is the personal representative of the President": Rep. Byrns); 2 U.S.C. Sec. 701(e) (Comptroller General listed as within the "Legislative Branch" in the Ethics in Government Act); 59 Stat. 616 (1945) (GAO stated to be part of legislative branch in Reorganization Act of 1945).
 
 
 28
 While we recognize the authority cited by the Army, we nevertheless cannot resolve the issue before us merely on the basis of the quantity of citation. We must beware of what Justice Cardozo described as "the tyranny of labels." Snyder v. Massachusetts, 291 U.S. 97, 114, 54 S.Ct. 330, 335, 78 L.Ed. 674 (1934). Indeed, in Buckley, the Supreme Court specifically noted that "irrespective of Congress' designation [of the Comptroller General as a "Legislative Officer"], cf. 31 U.S.C. Sec. 65(d), the Comptroller General is appointed by the President in conformity with the Appointments Clause [and therefore may exercise executive functions]." 424 U.S. at 128 n. 165, 96 S.Ct. at 686 n. 165.
 
 
 29
 Instead of "decision by label," we must focus on function and reality. Clearly, the GAO and the Comptroller General perform legislative and non-legislative duties. Indeed, they also perform quasi-judicial functions. In that respect, they resemble the modern regulatory agency. Therefore, the mere recital by the Army of the Comptroller General's legislative functions, which involve investigating and reporting to Congress, does not make the Comptroller General an agent of the legislature.
 
 
 30
 In characterizing the Comptroller General as an agent of the legislature, the Army also stresses the power of Congress to remove the Comptroller from office. The Army argues that Congress may constitutionally remove only its own agents, i.e., members of the legislative branch, and that Congress therefore in reserving to itself the power to remove the Comptroller General had implicitly acknowledged that the Comptroller General is an agent of the legislature. By the same token, argues the Army, Congress must have recognized that the Comptroller General could not be an agent of the executive, because Congress may not constitutionally remove from office agents who are purely executive in character.
 
 
 31
 To support this argument, the Army relies heavily on Myers v. United States, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926), in which the Supreme Court held that the President's power to remove purely executive officers could not be curtailed by Congress. However, Myers was severely limited by Humphrey's Executor, in which the Court approved Congress's attempt to insulate members of the Federal Trade Commission from removal without cause by the President.
 
 
 32
 We think it plain under the Constitution that illimitable power of removal is not possessed by the President in respect of officers of the character of those just named [members of FTC, ICC and Court of Claims]. The authority of Congress, in creating quasi-legislative or quasi-judicial agencies, to require them to act in discharge of their duties independently of executive control cannot well be doubted; and that authority includes, as an appropriate incident, power to fix the period during which they shall continue in office, and to forbid their removal except for cause in the meantime. For it is quite evident that one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will.
 
 
 33
 295 U.S. at 629, 55 S.Ct. at 874.
 
 
 34
 It is not clear whether Congress's power to limit removal by the President includes the power to retain to itself removal power over "mixed-power" officers of the United States. There are two questions implicated by the Army's argument on this issue, however, which must be addressed separately: (1) whether the provision permitting Congress to remove the Comptroller General is constitutional, and (2) whether the mere existence of this provision renders the Comptroller General an agent of Congress for the purposes of this case.
 
 A.
 
 35
 The first question is not ripe for review in this case at this time. Congress has never tried to remove a Comptroller General and is unlikely to do so in the foreseeable future. The constitutionality of the removal provision, therefore, has yet to be tested, and because Congress in this case has not sought to remove the Comptroller General, we do not deem the constitutionality of the removal provision to be justiciable. See Hastings v. Judicial Conference of the United States, 770 F.2d 1093, 1100-01 (D.C.Cir.1985).
 
 
 36
 By so holding, we decline to adopt the contrary conclusion reached in Synar, supra. In Synar, the court concluded that the issue of Congress' power to remove the Comptroller General was ripe for review, relying upon Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), in which the Supreme Court declared unconstitutional the delegation of Article III powers to bankruptcy judges not appointed in conformance with Article III. The district court in Synar held that since the Supreme Court had relied in part on the fact that bankruptcy judges could be removed for cause, the question of congressional removal power over the Comptroller General was similarly ripe for review. At 1391-1392.
 
 
 37
 Northern Pipeline, however, does not control the present case. The Court struck down the statutory scheme in that case as facially violative of Article III, in that bankruptcy judges were appointed to fixed 14 year terms and could be removed for cause. Since the Court found that the judges therefore were clearly not Article III judges under the plain language of the Constitution, the unconstitutionality of their appointment and exercise of power was immediately ripe for adjudication.
 
 
 38
 By contrast, in this case, there is no challenge to the appointment of the Comptroller General, which is agreed to be in conformance with the appointments clause, nor to the Comptroller General's 15 year statutory tenure. The only issue raised in this context is the constitutionality of the congressional removal provision, which has never been exercised in more than 60 years. Therefore, unlike Northern Pipeline, where the constitutionality question was ripe, here an additional act must be undertaken in order to meet the "ripeness" requirement. That act would be an attempted removal of the Comptroller General by Congress.
 
 
 39
 Moreover, even if the question were justiciable, and the provision granting Congress the power to remove the Comptroller General were found to be unconstitutional, that would only be because of a determination that the Comptroller General is indeed a member of the executive branch. The remedy in such a case would not be to hold the "stay" powers of the Comptroller General to be unconstitutional, but to sever as unconstitutional the provision which grants Congress the power to remove him. See Myers, 272 U.S. at 176, 47 S.Ct. at 45.[4]
 
 B.
 
 40
 As to the second question--whether the existence of Congress' power to remove the Comptroller General is determinative of the particular branch of which the Comptroller General is a member--our answer is that the power of removal does not determine to which branch the Comptroller General belongs. Rather, if anything, it is the power of appointment that should control. See Buckley v. Valeo, 424 U.S. 1, 126, 96 S.Ct. 612, 685, 46 L.Ed.2d 659 (1976). Moreover, the fact that the Comptroller General is not under executive control does not necessarily mean that he is under legislative control. Indeed, a practical analysis of how the Comptroller General and the GAO actually function reveals that the removal power vested in Congress is a power of limited importance. In more than 60 years of the GAO's existence, Congress has never exercised its power to remove a Comptroller General.
 
 
 41
 Viewed pragmatically, the Comptroller General functions independently of Congress in exercising his role of reviewing bid protests. There is no evidence in the record that Congress has ever, as a body or through individual members, exerted control over this process. With a 15-year, non-renewable term, the Comptroller General therefore appears to be one of the most independent officers in the whole of the federal government, and one whose functions are drawn from each of the branches. See Constitutionality of GAO's Bid Protest Function: Hearings Before the Subcomm. on Legislation and National Security of the House Comm. on Government Operations, 99th Cong., 1st Sess. 35-36 (1985) testimony of Prof. Sanford Levinson [hereinafter cited as Hearings ].
 
 
 42
 It is not surprising that, like many modern governmental units, the Comptroller General cannot neatly be labelled as totally the creature of one branch or another. This was recognized more than 20 years ago in United States ex rel. Brookfield Construction Co. v. Stewart, 234 F.Supp. 94, 99 (D.D.C.1964) aff'd, 339 F.2d 753 (D.C.Cir.1964):
 
 
 43
 The Comptroller General is the head of the General Accounting Office, 31 U.S.C. Sec. 41. Unlike heads of most departments and establishments of the Government, he occupies a dual position and performs a two-fold function. First, he makes investigations of matters relating to the receipt, disbursement and application of public funds, and reports the results of his scrutiny to the Congress with appropriate recommendations. In addition he pursues investigations that may be ordered by either House of Congress, or by any Committee of either House, in matters relating to revenue, appropriations or expenditures, 31 U.S.C. Sec. 53. In performing these functions the status of the Comptroller General is that of an officer of the legislative branch of the Government. The Congress has comprehensive authority to undertake investigations in aid of legislation, or in connection with the appropriation of funds. Investigations are an aid to legislation and to the making of appropriations and are therefore auxiliary to the basic functions of Congress. The Congress may conduct investigations either through Committees or through an official such as the Comptroller General.
 
 
 44
 The Comptroller General has also a second status as the chief accounting officer of the Government. His second principal function is that of approval or disapproval of payments made by Government departments and other agencies, as well as of settling and adjusting accounts in which the Government is concerned, 31 U.S.C. Sec. 71. This is an executive function and in performing it the Comptroller General acts as a member of the Executive branch of the Government. The dual status of the General Accounting Office is not anomalous, for many regulatory commissions fulfill in part a legislative function and in part carry out executive duties, Humphrey's Executor v. United States, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 [1935]. Cf. Myers v. United States, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 [1926]. Thus we have developed in comparatively recent years a fourth type of Government agency,--one that combines two kinds of basic powers.
 
 
 45
 Id. at 99-100 (quoted with approval by court below, 607 F.Supp. at 970-71). We adopt the reasoning of the court in Brookfield Construction that the GAO is best viewed as a part of a headless "fourth branch" of government consisting of independent agencies having significant duties in both the legislative and executive branches but residing not entirely within either.
 
 
 46
 The description of the Federal Trade Commission contained in Humphrey's Executor provides a close analogy for describing the GAO and the Comptroller General:
 
 
 47
 The commission is to be non-partisan; and it must, from the very nature of its duties, act with entire impartiality. It is charged with the enforcement of no policy except the policy of the law. Its duties are neither political nor executive, but predominantly quasi-judicial and quasi-legislative. Like the Interstate Commerce Commission, its members are called upon to exercise the trained judgment of a body of experts, "appointed by law and informed by experience." [citation omitted].
 
 
 48
 [The Commission is to be] "independent of any department of the government ... a board or commission of dignity, permanence, and ability, independent of executive authority, except in its selection, and independent in character."
 
 
 49
 295 U.S. at 624-25, 55 S.Ct. at 872 (quoting statement of Senator Newlands).
 
 
 50
 The district court correctly followed Brookfield Construction in holding that the GAO is a hybrid agency of the kind described in Humphrey's Executor and that the Comptroller General may constitutionally exercise executive functions in reviewing bid protests because he is appointed pursuant to the Appointments Clause and performs executive duties. Although a legislative officer may not be given executive duties, many executive or "fourth branch" officers perform mixed duties and therefore function in dual capacities. As the Supreme Court noted in Springer v. Phillipine Islands, 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1928):
 
 
 51
 Not having the power of appointment, unless expressly granted or incidental to its powers, the legislature cannot engraft executive duties upon a legislative office, since that would be to usurp the power of appointment by indirection; though the case might be different if the additional duties were devolved upon an appointee of the executive.
 
 
 52
 Id. at 202, 48 S.Ct. at 482, quoted with approval in Buckley, 424 U.S. at 136-37, 96 S.Ct. at 690-91.[5]
 
 
 53
 Our decision that both the GAO and the Comptroller General discharge their assigned functions with a measure of independence from both the legislative and executive branches undermines the Army's reliance on Buckley and Chadha. In both of those cases, the legislature usurped the executive's power by subjecting agency actions to direct political control. In Buckley, it did so by appointing members of the Federal Election Commission. In Chadha, it did so by ordering the deportation of an alien by a resolution not passed by both Houses or presented to the President. Here, no political, i.e., legislative control is being asserted over any executive prerogative; an additional executive power or non-legislative function has merely been assigned to an agency which from its inception has been functionally independent of political control.[6]
 
 
 54
 It must not be overlooked that through CICA, the act in question here, Congress has given the Comptroller General no ultimate veto over government appropriations. It has done no more than to furnish the Comptroller General with a tool to prevent faits accomplis and to encourage competition in contracting. The power of the contracting executive agency to override the stay in important circumstances provides a safety valve for any possible abuse by the Comptroller General. Most importantly, the long history of independence of the GAO supports the district court's view that the stay provision does not operate to permit intrusion by the legislative branch into executive or judicial decision making. Thus, the delicate balance of power among the branches of government has not been endangered or upset by our answer to the second question which we posed: that the mere existence of the power of Congress to remove the Comptroller General does not render the Comptroller an agent of Congress for the purpose of this case.[7]
 
 IV.
 
 55
 Although we hold that the district court properly upheld the constitutionality of the Comptroller General's stay powers, the Army argues forcefully that the injunction granted was unnecessarily broad. We recognize that the Army in so arguing must overcome the considerable discretion granted to the district court in framing injunctions. Lemon v. Kurtzman, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973). The trial court must be given leeway to fashion effective remedies to correct offenses to the Constitution. Ramirez de Arellano v. Weinberger, 745 F.2d 1500, 1521 (D.C.Cir.1984) (en banc). Nevertheless, injunctive relief should be no broader than necessary to provide full relief to the aggrieved party. Califano v. Yamasaki, 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979).
 
 
 56
 The Army argues that the district court attempted to require observance of the CICA stay provisions on a "government-wide" basis, i.e., nationally. On its face, the court's order contains no limiting language to rebut this reading. However, it is apparent from the court's oral opinion that it intended to order the federal government to observe CICA only within the District of New Jersey--the court's proper jurisdiction. See 610 F.Supp. at 756. Nevertheless, we agree that the injunction, even thus construed, went beyond that which was necessary to secure Ameron's rights.
 
 
 57
 There is no dispute that the Congressional intervenors were proper parties for the purpose of supporting the constitutionality of the CICA stay provision. See Chadha, 462 U.S. at 940, 103 S.Ct. at 2778.[8] To the extent, then, that the court declared CICA to be constitutional, the Congressional intervenors had standing to obtain the relief granted. However, the intervenors lack their own standing to obtain an injunction forcing compliance with the law. Nothing in the Ameron controversy gives Congress a direct "stake" in the enforcement of CICA. Once a law is passed and upheld as constitutional, Congress's interest in its enforcement is no more than that of the average citizen. See Moore v. House of Representatives, 733 F.2d 946, 951-52 (D.C.Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 779, 83 L.Ed.2d 775 (1985). An ordinary citizen, in turn, has no standing to obtain an injunction to enforce the law, absent a personal stake in such enforcement. Allen v. Wright, 468 U.S. 737, 104 S.Ct. 3315, 3326, 82 L.Ed.2d 556 (1984); AFGE v. Pierce, 697 F.2d 303, 305 (D.C.Cir.1982). The Congressional intervenors, therefore, do not have independent standing to seek an injunction ordering the federal government to enforce CICA.
 
 
 58
 However, despite their lack of independent standing, the intervenors may be entitled to injunctive relief on the same grounds and to the same extent as was available to Ameron. See Director OWCP v. Perini North River Associates, 459 U.S. 297, 302-305, 103 S.Ct. 634, 639-641, 74 L.Ed.2d 465 (1982) (to the extent OWCP Director does not have separate standing, he may seek reversal of lower court decision on grounds available to nonappealing aggrieved party). The question then is: what relief was available to Ameron?
 
 
 59
 In the absence of a certified class action, Ameron was only entitled to relief for itself. National Center for Immigrant Rights v. INS, 743 F.2d 1365, 1371-72 (9th Cir.1984); Davis v. Romney, 490 F.2d 1360, 1366 (3d Cir.1974). While the district court's entry of a declaratory judgment of constitutionality[9] may serve as precedent for subsequent cases, an injunction directing the Army Corps of Engineers to honor the stay provision of CICA only in this case provides full relief to Ameron. See Baeder v. Heckler, 768 F.2d 547, 553 (3d Cir.1985) (striking down nation-wide injunction but leaving intact holding that regulation was invalid and grant of injunctive relief in plaintiff's case).
 
 
 60
 Ameron and the Congressional intervenors make several arguments in support of the broader relief granted. First of all, they argue that the Army never made any formal objection to the proposed scope of relief. We are not impressed with this claim, since the Army made clear during its colloquy with the district court that it objected to the broader injunctive relief granted. See May 28 transcript at 25-29.
 
 
 61
 More importantly, Ameron and the Congressional intervenors argue that the broader injunction was justified as a response to two expressions of defiance by the executive of each of its coordinate branches: First, the executive declared a duly enacted and signed law (CICA) to be unconstitutional and second, the executive intimated that it would not follow court decisions upholding that law.
 
 
 62
 As to the first issue, the record shows that upon the President's orders, the Attorney General instructed all executive agencies to ignore the stay provisions in CICA.[10] The Justice Department sought to justify this action as within the President's duty to defend the Constitution: "[I]n the case of a conflict between the Constitution and a statute, the President's duty faithfully to execute the law requires him not to observe a statute that is in conflict with the Constitution, the fundamental law of the land." Hearings at 318 (testimony of Acting Deputy Attorney General D. Lowell Jensen). See also Meese, President's Right to Challenge Law, N.Y. Times, May 21, 1985 (Letter to the Editor) Supp.App. at 180.
 
 
 63
 This claim of right for the President to declare statutes unconstitutional and to declare his refusal to execute them, as distinguished from his undisputed right to veto, criticize, or even refuse to defend in court, statutes which he regards as unconstitutional, is dubious at best.[11] The question of the President's actions, declarations, and purported refusal to order compliance with CICA, however, was not properly before the district court. Therefore, our task on this appeal is similarly limited to ruling only on the constitutionality of the statute before us, and on whether the remedy fashioned by the district court granted appropriate relief to the parties actually before the court. We are faced with no justiciable claim against the President stemming from an alleged usurpation of power.
 
 
 64
 The second challenged assertion of power by the executive branch is the threat of Attorney General Meese not to follow court decisions in this case. According to the Attorney General's testimony before the House's Committee on the Judiciary on April 18, 1985, the district court is not a "court of competent jurisdiction" to decide constitutional questions. Transcript of House Hearings at 24-25. Moreover, Mr. Meese declared the government's intention not to follow the district court's decision granting a preliminary injunction in Ameron until there was "an appellate decision." Id. at 31. Questioned further, Mr. Meese suggested that even a decision of this court--the Court of Appeals for the Third Circuit--might be ignored until the Supreme Court finally laid the matter to rest. Id. at 35-36. However, following the granting of permanent relief by the district court, the Army agreed to honor the stay provisions of CICA pending the disposition of this appeal. See Brief of Appellee-Intervenors Speaker and Bipartisan Leadership Group of the House of Representatives at 18-19.
 
 
 65
 In framing its relief, the district court was understandably concerned with the executive challenge to its power. The district court engaged counsel for the Army in a discussion regarding the district court's competence to rule on CICA's constitutionality. In so doing, it elicited a concession that the court did have jurisdiction to rule on the question and to enforce its view through injunction in the District of New Jersey. May 28 transcript at 27. In its oral opinion, the court stressed its rejection of the executive's assertion of power to ignore an order of the district court and the suggestion of Attorney General Meese that the district court was not a court of "competent jurisdiction." 610 F.Supp. at 755-56.
 
 
 66
 It should be too obvious even to require restating that the district court, as an Article III court, has the power to rule on the constitutionality of an act of Congress and to impose appropriate remedies to compel compliance with an act found to be constitutional. That the executive in this case questioned this elementary principle did not, however, alter the specific task before the district court: to frame an injunction no broader than necessary to grant the full relief to which Ameron and the Congressional intervenors were entitled.
 
 
 67
 As Justice Douglas observed in his Youngstown concurrence, "[T]he emergency did not create power; it merely marked an occasion when power should be exercised." 343 U.S. at 629, 72 S.Ct. at 886. Similarly, here, the felt need to reassert the constitutional scope of its power in the face of executive challenge did not create power in the district court that it did not already have, or change the judicial standards for the granting of injunctive relief. We therefore affirm the district court's obviously correct ruling that it is a court of competent jurisdiction to decide constitutional questions, even though we find the granted injunctive relief to be too broad under the circumstances of this case.
 
 
 68
 An injunction applying only to Ameron--ordering application of the CICA stay provisions in Ameron's case--would have provided Ameron with complete relief. While it was within the constitutional power of the court to grant broader relief, jurisprudence governing injunctive remedies will not permit it. We therefore affirm the May 20, 1985 order of the district court,[12] except as to its final paragraph which we modify. See Evans v. Buchanan, 555 F.2d 373, 381 (3d Cir.1977) (en banc). The final paragraph of the district court's order originally provided:
 
 
 69
 FURTHER ORDERED that defendants U.S. Army Corps of Engineers, Caspar W. Weinberger and David A. Stockman are permanently enjoined from applying Federal Acquisition Circular 84-6 or OMB Bulletin No. 85-8 insofar as they conflict with 31 U.S.C. Sec. 3553, and are permanently enjoined to secure the issuance of regulations which comply with and implement 31 U.S.C. Sec. 3553.
 
 
 70
 We hold here that this provision granted relief broader than that to which Ameron was entitled. We therefore substitute for that provision in the district court's order the following language appropriate to the case before us:FURTHER ORDERED that defendants U.S. Army Corps of Engineers, Casper W. Weinberger, and David A. Stockman are permanently enjoined to comply with and implement 31 U.S.C. Sec. 3553 in the case of Ameron, Inc.'s bid protest filed March 1, 1985.
 
 V.
 
 71
 The May 20, 1985 order of the district court, as modified herein, will be affirmed in all other respects.
 
 APPENDIX
 
 72
 Text of District Court Order of May 20, 1985
 
 
 73
 This matter coming on to be considered by the court on application of Charles Tiefer on behalf of the Speaker and Bipartisan Leadership Group of the House of Representatives as plaintiffs-intervenors, and Morgan Frankel, on behalf of the Senate, plaintiff-intervenor, and it appearing from the papers submitted, the prior oral argument, the entire record in this case, and the Opinion of this Court filed on March 28, 1985, that there are no material facts in genuine dispute regarding the issue of the constitutionality of the stay provision in the Competition in Contracting Act, 31 U.S.C. Sec. 3553, and that plaintiff and the intervenors are entitled to judgment as a matter of law, and for good cause
 
 It is on this 20th day of May 1985:
 
 74
 ORDERED that in issuing its Opinion filed March 28, 1985, and in issuing this Order, this Court has been exercising the historic jurisdiction regarding the constitutionality of Acts of Congress, possessed by the Judiciary alone, of a court of competent jurisdiction;
 
 
 75
 FURTHER ORDERED that intervenors' motions for summary judgment be, and they are hereby granted; and it is
 
 
 76
 FURTHER ORDERED that 31 U.S.C. Secs. 3553 be and it is hereby declared to be constitutional; and it is
 
 
 77
 FURTHER ORDERED that defendants U.S. Army Corps of Engineers, Caspar W. Weinberger and David A. Stockman are permanently enjoined from applying Federal Acquisition Circular 84-6 or OMB Bulletin No. 85-8 insofar as they conflict with 31 U.S.C. Sec. 3553, and are permanently enjoined to secure the issuance of regulations which comply with and implement 31 U.S.C. Sec. 3553.
 
 
 78
 /s/ Harold A. Ackerman
 
 Harold A. Ackerman
 
 79
 U.S.D.J.
 
 BECKER, Circuit Judge, concurring in part:
 
 80
 I join in Parts II and IV of the majority's opinion, and in its judgment. I disagree fundamentally with the majority's analysis in Part III however, and write separately to explain my views.
 
 I.
 
 81
 Central to the majority's finding that CICA is not unconstitutional is its conviction that the Comptroller General occupies an indeterminate place in our constitutional scheme, belonging to neither the legislative, nor the executive, nor the judicial branch. Relying on United States ex rel. Brookfield Construction Co. v. Stewart, 234 F.Supp. 94 (D.D.C.1964), aff'd., 339 F.2d 753 (D.C.Cir.1964), the majority states that "the Comptroller General cannot neatly be labelled as totally the creature of one branch or another," Maj.Op. at 885, and that "the GAO is best viewed as a part of a headless 'fourth branch' of government." Id. at 886.
 
 
 82
 Having thus severed the Comptroller General from any constitutional moorings within one of the three branches of government, the majority argues that because the GAO and the Comptroller General are "functionally independent of political control," id. at 887, and because the GAO has a "long history of independence," id. at 887, the powers granted the Comptroller General are not unconstitutional. According to the majority: "the delicate balance of power among the branches of government has not been endangered or upset [by the provision of CICA permitting congressional removal for cause of the Comptroller General]," id., and CICA is thus constitutional.
 
 
 83
 In my view, the majority's argument has gone awry on its very first step, its refusal to place the Comptroller General in one branch of government or another. The Constitution establishes three branches of government, not four. Moreover, because ours is a government of enumerated powers, there can be no branch of government not established by the Constitution. It therefore follows that there can be no fourth branch, headless or otherwise.
 
 
 84
 I admit that scholars often refer to administrative agencies as the "fourth branch" of government. See, e.g., Strauss, The Place of the Agencies in Government: Separation of Powers and the Fourth Branch, 84 Colum.L.Rev. 573 (1984). The Supreme Court, however, has not acknowledged that administrative agencies, even the so-called independent regulatory agencies, belong to a category all their own. To the contrary, the Supreme Court continues to frame its separation of powers analyses in the context of the familiar triumvirate of branches. See, e.g., INS v. Chadha, 462 U.S. 919, 951, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983) ("The Constitution sought to divide the delegated powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial."); Buckley v. Valeo, 424 U.S. 1, 120, 96 S.Ct. 612, 682, 46 L.Ed.2d 659 (1976) (in analyzing the constitutionality of the powers of the Federal Election Commission, an "independent" administrative agency, the Court referred to the "fundamental principles of the Government ... that the powers of the three great branches of the National Government be largely separate from one another."). The majority's insistence on a fourth branch, while perhaps intellectually fashionable, is thus contrary to the jurisprudence of the Supreme Court.[1]
 
 
 85
 I do not deny that administrative agencies are and must be part of our government, and I do not suggest that they lack legitimacy simply because they were not envisaged by the Founding Fathers. Administrative agencies developed as a response to the needs of a complex society, and so long as our society remains as complex as it is, we shall need them. My point is simply that courts engaged in constitutional analysis must work within the framework established by the Constitution, and the Constitution does not allow for any more than three branches of government. If the administrative agencies cannot fit within this framework then the framework should perhaps be changed, but if this is to be done it must be by constitutional amendment, not judicial disregard of the present Constitution. Even a living constitution cannot grow a new branch.
 
 
 86
 In analyzing the case before us, our first task must therefore be to decide to which of the three branches of government the GAO belongs. The next step in the analysis is to classify the powers conferred on the Comptroller General by the allegedly objectionable provisions of CICA. Only then can we decide whether those powers violate the Constitution.
 
 II.
 A.
 
 87
 Because the office of the Comptroller General is created by statute, the Comptroller General's status within the government is a matter of statutory interpretation which, like all statutory interpretation, is controlled by legislative intent. Paskel v. Heckler, 768 F.2d 540, 543 (3d Cir.1985); Murphy, Old Maxims Never Die: The "Plain Meaning" Rule and Statutory Interpretation in the "Modern" Federal Courts, 75 Colum.L.Rev. 1299, 1299 (1975). There is copious evidence in the legislative history that the GAO (and therefore the Comptroller General) was intended to be in the legislative branch. This evidence is summarized concisely by the majority, and there is no need to repeat it here. See Maj.Op. at 882 (summarizing legislative history and citing cases that arrive at the same conclusion). Because there is no evidence of legislative intent to the contrary, I believe that it is incumbent upon us to hold that the Comptroller General is within the legislative branch of government, despite the inconveniences that may attend such a holding.
 
 
 88
 The majority's reluctance to classify the Comptroller General as legislative stems from two sources: (a) the fact that certain of the Comptroller General's functions are executive in nature, see infra at 893-894, and (b) the fact that the Comptroller General is appointed by the President. See Maj.Op. at 892. Although both of these facts are relevant to the question whether any of the statutes affecting the Comptroller General unconstitutionally violate the principle of separation of powers, see infra 895-896, neither is relevant to the logically prior question: to which branch does the Comptroller General belong? As I have noted, because the office of the Comptroller General is created by statute, his status must be determined by legislative intent.[2] In this case, the legislative intent is clear--he belongs to the legislative branch.
 
 B.
 
 89
 Having determined that the Comptroller General is a member of the legislative branch, the next step in the analysis is to determine whether CICA grants the Comptroller General any functions that are executive or judicial rather than legislative. On this point, the parties agree that the following powers granted to the Comptroller General by CICA are not legislative: the powers to (i) review protests and issue recommendations on their adequacy, 31 U.S.C.A. Sec. 3554 (West Supp.1985), (ii) lift the automatic stay imposed by the filing of the protest, id., and (iii) demand attorneys fees and costs on a finding that the solicitation was unlawful, id.
 
 
 90
 I agree with the parties' conclusions. Although the meanings of "legislative," "executive," and "judicial" are somewhat indeterminate, I find it hard to believe that the powers listed above would fit under any of the more common understandings of "legislative power." In exercising these powers, the Comptroller General acts on a case-by-case basis; he applies law rather than makes it. The powers are executive, or even quasi-judicial, rather than legislative. Although in other contexts the distinction between executive and judicial would be quite important, here it is not, and I therefore pass over it. The important point, which no party contests, is simply that the Comptroller General, a legislative officer, undeniably exercises non-legislative powers.
 
 C.
 
 91
 The inquiry cannot end here. The three branches of government, although separate, are not airtight. See Nixon v. Administrator of General Services, 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977); United States v. Nixon, 418 U.S. 683, 703, 94 S.Ct. 3090, 3105, 41 L.Ed.2d 1039 (1974). The Supreme Court has adopted a flexible approach, and has expressly endorsed the eloquent language of Justice Jackson in Youngstown Sheet & Tube Co. v. Sanger, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring):
 
 
 92
 While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.
 
 
 93
 The doctrine of separation of powers thus allows for some overlap among the branches. It could scarcely be otherwise, for virtually every branch has members who perform work that can be characterized as belonging to another branch. In the judiciary, for example, the Chief Judge, Circuit Executive, and Clerk of this Court exercise administrative responsibility that is executive rather than judicial. Every legislator has aides who do similar administrative/executive-type work. Administrative agencies that are within the executive branch often engage in both rulemaking, which is legislative in character, and adjudication, which is, of course, judicial.
 
 
 94
 The proper question in the separation of powers context, therefore, is not merely whether members of one branch do work that falls within the description of another. Rather, the question is whether, by that work, the branch to which those members belong infringes so substantially on the other branch that the infringed-upon branch cannot carry out its constitutionally assigned functions. This test was explicitly enunciated by the Supreme Court in Nixon v. Administrator of General Services, supra, 433 U.S. at 443, 97 S.Ct. at 2790: "[I]n determining whether the Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions."
 
 
 95
 Even this test is not immediately accessible, for "constitutionally assigned functions" is not a readily definable term. Each branch has many constitutionally assigned--or, at least, constitutionally permitted--functions. To give definition to the term, it is therefore necessary to place the problem in context, that is, to identify the objectives to be served by the principle of separation of powers and see if those objectives are threatened by the Comptroller General's CICA-derived powers.
 
 
 96
 Although scholars may debate the intricacies and wisdom of separation of powers, the original intent of the Founding Fathers in creating our system of divided powers is very clear and can be briefly stated. The principal goal of the Founding Fathers in enacting a system of separated powers was the protection of individual liberties. The colonists had experienced virtual tyranny at the hands of all three branches in their recent histories, see G. Wood, The Creation of the American Republic 1776-1787 604-05 (1969); Levi,Some Aspects of Separation of Powers, 76 Colum.L.Rev. 369, 373-76 (1976), and had concluded that only by diffusing power within the government could individual liberty be preserved. Echoing Montesquieu, James Madison wrote "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands ... may justly be pronounced the very definition of tyranny." Federalist No. 47 (Madison) in The Federalist, 373-74 (Hamilton ed. 1864); cf. Montesquieu, The Spirit of the Laws, 38 Great Books of the Western World 70 (Hutchins ed. 1952) ("When the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty."). See also Youngstown Sheet & Tube Co. v. Sanger, supra, 343 U.S. at 635, 72 S.Ct. at 870 ("the Constitution diffuses power the better to secure liberty") (Jackson, J., concurring).[3]
 
 
 97
 We are now in a position to ask the central question in this case: do the executive-judicial powers conferred upon the Comptroller General by CICA threaten to coalesce powers in one branch such that individual liberty--in this case, the liberty of those in Ameron's position who bid for contracts covered by the CICA--is threatened? I think not. Three factors in particular convince me that the threat is not severe. First, CICA permits the executive branch unilaterally to override the automatic stay by submitting to the Comptroller General a written statement of "urgent and compelling circumstances which significantly affect interests of the United States." 31 U.S.C.A. Sec. 3553(c)(2)(A). Thus, there need be no severe effects on the prerogative of the executive as a result of the Comptroller General's powers.[4] Admittedly, Sec. 3553(c)(2)(A) is not an executive carte blanche. The "urgent and compelling circumstances" must in fact exist, and I presume that this would be determined by a court of law--the third branch. Nevertheless, the limitation on the Comptroller General's powers is real and diminishes the threat to the goals of separation of powers.
 
 
 98
 Second, Congress has no voice in the Comptroller General's day-to-day operations, and it holds no sword of Damocles over the Comptroller General's head. Congress' only power over the Comptroller General, its power of removal, is circumscribed because it requires a joint resolution of Congress, and must be for one or more of five specified reasons: permanent disability, inefficiency, neglect of duty, malfeasance, or conduct which is felonious or involves moral turpitude. 31 U.S.C. Sec. 703(e) (1982). The joint resolution will likely be more difficult to pass than a majority vote in one house, and the five reasons, although not so narrow as to deny Congress any leeway, circumscribe Congress' power to some extent by providing a basis for judicial review of congressional removal. The result of this limitation is that, as a practical matter, Congress has not exercised, and probably will never exercise, such control over the Comptroller General that his non-legislative powers will threaten the goal of dispersion of power, and hence the goal of individual liberty, that separation of powers serves.
 
 
 99
 It is particularly instructive in this regard to compare this case with INS v. Chadha, supra, heavily relied upon by the Army. Although both cases involve an infringement by the legislative branch into the domain of the executive, the nature of the infringements are very different. The unicameral legislative veto struck down in Chadha had all the earmarks of a hastily considered, unjust bill of attainder: there was neither a published committee report nor a debate, but only a conclusory statement on the floor of the House by a single Representative. Congress made the decision to deport Chadha by an unrecorded vote. Id. 462 U.S. at 926-27, 103 S.Ct. at 2771-72 (Opinion of the Court); id. at 963-64, 103 S.Ct. at 2790-91 (Powell, J., concurring). Here, by contrast, there is no direct congressional involvement, and consequently the danger sought to be avoided in Chadha --the involvement of political passions in quasi-judicial proceedings--is simply not present. Bidders like Ameron realistically need not fear significant and improper congressional involvement.
 
 
 100
 Finally, it must not be forgotten that the President appoints the Comptroller General. Although the power of appointment does not give the President continuing control over the Comptroller General, it does give the President the opportunity to put into that office someone who will be respectful of the prerogatives, and sympathetic to the problems, of the executive branch. Once again, this is a significant feature of the case before us that lessens the severity of the congressional infringement on executive powers and distinguishes this case from those, like Chadha, in which the infringement and threat to liberty is more severe.
 
 III.
 
 101
 My analysis is in many ways similar to the majority's. For both of us, the independence of the Comptroller General from congressional control and the limited power of the Comptroller General over the President are central to our decision. The majority might thus contend that our differences are merely semantic, and that I toil under a " 'tyranny of labels.' " See Maj.Op. at 883 (quoting Snyder v. Massachusetts, 291 U.S. 97, 114, 54 S.Ct. 330, 335, 78 L.Ed. 674 (1934) (Cardozo, J.)). But the majority would be wrong. What is at stake is our adherence to the system of government established by the Constitution. It is essential that we write--and think--only in terms of the three branches, and that we permit no more than the terms of the Constitution, fairly interpreted, will allow.
 
 
 102
 I can only surmise that the majority was attracted to the concept of the headless fourth branch because of its fear that the Comptroller General, and all other "independent" administrative agencies, could not survive an analysis that allowed for only three branches of government. I have explained, see supra II.C., why I believe the concept of separation of powers is sufficiently flexible to accommodate the CICA. I assume that similar analyses would lead to the same results for most other administrative agencies, although I cannot be sure.[5] I am certain, however, that if some agency powers cannot fit within a government of three branches, or if certain legislation permitting one branch to affect the affairs of another cannot be countenanced within the three-branch framework, then those agency powers and that legislation must fall. The judiciary cannot invent a fourth branch to house them. Otherwise, we risk the very tyranny the Founding Fathers sought so ingeniously to avoid.
 
 
 
 *
 Honorable Daniel H. Huyett, 3rd, United States District Court for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 The original typed bond amount of $1,200,000 was "whited-out" and the bond amount of $3,000,000 was typed over the corrected portion of the bond document. App. at 8-9
 
 
 [2]
 In essence, the Comptroller General held that it was not arbitrary for the Army to reject Ameron's bid due to the altered bond document
 
 
 [3]
 The three-judge court was convened pursuant to 28 U.S.C. Sec. 2284. See Synar v. United States, 626 F.Supp. 1374, 1378 n. 1 (D.D.C.1986)
 
 
 [4]
 The Synar court rejected a similar argument on the ground that it had no authority to "choose" whether to invalidate the Comptroller General's powers or Congress' removal power. In so doing, the court observed that courts faced with constitutionally incompatible statutes generally "set aside that statute which either allegedly prohibits or allegedly authorizes the injury-in-fact that confers standing upon the plaintiff." At 1393
 However, if the question of Congress' removal power is ripe in this case at all, than a fortiori it is also within the authority of the court to declare that power unconstitutional, making a "choice" unavoidable. In the context of the present case, it would seem more logical to sever this never-used power rather than to strike down Congress' new statutory scheme in CICA. By contrast, in Synar, the court addressed a congressional scheme providing for "fallback" procedures in the event that the involvement of the Comptroller General in deficit reduction was deemed unconstitutional. See at 1394-1395.
 
 
 [5]
 In contrast to our holding, the Synar court held that the Comptroller General's significant executive powers under the Gramm-Rudman-Hollings Act placed it in a "no-man's land" controlled by neither Myers, which concerned purely executive officers, nor Humphrey's Executor, which concerned officials exercising only incidental executive functions along with primarily quasi-legislative or quasi-judicial powers. At 1400. The Synar court then focused almost exclusively on the question of the removal power and, finding the retention of that power by Congress to be incompatible with the Comptroller General's exercise of executive budget-cutting functions, struck down the applicable parts of the Act
 Just as we have declined to follow Synar with respect to the constitutionality of Congress' removal power, we also decline to follow the approach taken by the Synar court here. The core principle of Humphrey's Executor was that Congress could create agencies exercising dual functions and which were independent of unfettered executive control. In their blend of powers and functions, the Comptroller General and the GAO closely resemble the FTC and other "fourth branch" agencies. There is, therefore, little basis for distinguishing Humphrey's Executor in the present case. We need not reach the question whether Congress might at some point violate the separation of powers by assigning to the Comptroller General or some other official independent of executive control too great a preponderance of fundamentally executive powers or functions. This is not such a case.
 We do note, however, that the result in Synar seems to be based, at least in part, on the court's perception that "[i]t is not as obvious today as to it seemed in the 1930s that there can be such things as genuinely 'independent' regulatory agencies." At 1398. However, as noted infra at note 6, the principles underlying Humphrey's Executor have been widely accepted for half a century. We do not read INS v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) to the contrary or as undercutting these principles.
 
 
 [6]
 Although the issue is not squarely presented by this case, we have not been unaware of the current public debate over the constitutionality of the entire scheme of independent agencies constituting the "fourth branch." In particular, we recognize that Attorney General Meese has questioned whether agencies exercising executive power may be kept independent of presidential authority. See A Question of Power, A Powerful Questioner, N.Y. Times, Nov. 6, 1985, at B8, col. 3
 We note that the constitutionality of independent agencies has been settled for half a century. See Humphrey's Executor v. United States, 295 U.S. 602, 629, 55 S.Ct. 869, 874, 79 L.Ed. 1611 (1935). However, to the extent that the Attorney General finds constitutional support for his assertion that every agency must be considered a part of a particular branch of government, this argument may cut against the Army's position in this case. In a September 13, 1985 speech reported in the New York Times, the Attorney General said: "Federal agencies performing executive functions are themselves properly agents of the executive. They are not 'quasi' this or 'independent' that. In the tripartite scheme of government, a body with enforcement powers is part of the executive branch of government." N.Y. Times, supra, at B8, col. 5-6.
 Since it is undisputed that the Comptroller General and the GAO perform significant executive functions along with their legislative functions, the Attorney General's view would seem to regard them as part of the executive branch, a position contrary to the Army's argument in this case.
 
 
 [7]
 Because we hold that the Comptroller General is not exclusively a legislative agent, we need not reach the questions of whether the automatic stay could survive as a "report and wait" provision and whether, if unconstitutional, the Comptroller General's stay-lifting power is severable
 
 
 [8]
 Chadha actually only held that Congress properly intervenes to defend its statute when both plaintiffs and government defendants agree that a statute is unconstitutional, i.e., when there is no one to speak for the constitutionality of the statute. Here, where Ameron argued that the statute was constitutional, arguably there is less need to recognize Congress's standing. However, the parties agree, and we concur, that Congress has standing to intervene whenever the executive declines to defend a statute or, as in this case, actually argues that it is unconstitutional
 
 
 [9]
 See Appendix to this opinion for the district court's order of May 20, 1985
 
 
 [10]
 Pursuant to the Attorney General's instruction, the Office of Management and Budget issued OMB Bulletin No. 85-8 (Dec. 17, 1984), which required, inter alia, that:
 Agencies shall take no action, including the issuance of regulations, based upon the invalid provisions [of CICA].
 With respect to the "stay" provision, agencies shall proceed with the procurement process as though no such provision were contained in the Act. Pursuant to the provisions of the Federal Acquisition Regulations, the agency may voluntarily agree to stay procurements pending the resolution of bid protests, but the grant of such a stay must be based upon other valid authority and may not be based upon the invalid stay provisions of the Act.
 Agencies shall comply with the provisions of 31 U.S.C. Sec. 3553(b) concerning the submission of reports to the Comptroller General on protested procurements.
 With respect to the damages provision of the Act, agencies shall not comply with declarations of awards of costs, including attorneys' fees or bid preparation costs, made by the Comptroller General.
 Agencies shall comply with 32 U.S.C. Sec. 3554(e) concerning submission of reports to the Comptroller General on unaccommodated recommendations.
 
 
 [11]
 See Kendall v. United States, 12 Pet. 524, 613, 37 U.S. 524, 613, 9 L.Ed. 1181 (1838) ("To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the Constitution, and entirely inadmissable.") The President's job is to execute law, not to create it. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587, 72 S.Ct. 863, 866, 96 L.Ed. 1153 (1952). Moreover, "it is, emphatically, the province and duty of the judicial department, to say what the law is." Marbury v. Madison, 1 Cranch 137, 177, 5 U.S. 137, 177, 2 L.Ed. 60 (1803). Absent a patently unconstitutional law or one infringing liberty interests or other fundamental rights of individuals, the President's asserted power and "duty" not to execute laws he finds to be unconstitutional is questionable. See Hearings at 39, 44 (testimony of Prof. Sanford Levinson); id. at 46-47 (testimony of Prof. Eugene Gressman)
 
 
 [12]
 See Appendix to this opinion for the full text of the original order of the district court
 
 
 [1]
 Although in FTC v. Ruberoid Corp., 343 U.S. 470, 72 S.Ct. 800, 96 L.Ed. 1081 (1952), Justice Jackson did refer to administrative agencies as "a veritable fourth branch," id. at 487, 72 S.Ct. at 810 (Jackson, J., dissenting), that was merely descriptive; Justice Jackson was hardly setting it forth as part of a new framework for constitutional analysis. Indeed, his qualification of the description--"a veritable fourth branch"--suggests that he did not intend to be taken literally
 The only other occasions on which any member of the Supreme Court has used "fourth branch" in an opinion when referring to administrative agencies have also been in dissents and have been similarly off-hand and descriptive, rather than analytic. See Process Gas Consumers Group v. Consumer Energy Council of America, 463 U.S. 1216, 1219, 103 S.Ct. 3556, 3558, 77 L.Ed.2d 1402 (1983) (White, J., dissenting); INS v. Chadha, supra, 462 U.S. at 984, 103 S.Ct. at 2801 (White, J., dissenting) (quoting FTC v. Ruberoid, supra ).
 
 
 [2]
 The Senate argues in its brief that the fact that the Comptroller General is appointed by the President precludes his being part of the legislative branch. In making this argument, the Senate relied on Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). See also Maj.Op. at 892 (citing Buckley for the proposition that the executive functions of the Comptroller General and his appointment by the President "arguably render the Comptroller an 'Officer of the United States,' " i.e., a member of the executive branch.). This reliance is misplaced, for Buckley never suggested that all those appointed by the President are necessarily members of the executive branch of government. Buckley held that only those appointed by the President could be "Officers of the United States," but we are concerned here with the obverse problem, never contemplated by Buckley, whether all those so appointed are necessarily Officers of the United States
 The only reference in Buckley to the Comptroller General came in a footnote in which the Supreme Court rejected an analogy between the members of the Federal Election Commission (who were not appointed by the President) and the Comptroller General. The Court said that "irrespective of Congress' designation [of the Comptroller General as a legislative officer], the Comptroller General is appointed by the President in conformity with the Appointments Clause." Buckley v. Valeo, supra, 424 U.S. at 128 n. 165, 96 S.Ct. at 686 n. 165. This offhand reference is not sufficient to support the Senate's point that appointment by the President with the advice and consent of the Senate automatically makes one a member of the executive branch. The Buckley Court intended to distinguish the Comptroller General from the members of the Federal Election Commission, not to establish a general rule for a situation that was not before it.
 Not only is the Senate's reliance on Buckley weak, but there are counter-examples that disprove its thesis. There are undisputed legislative officers who are appointed by the President--the Librarian of Congress, 2 U.S.C. Sec. 136 (1982), the Public Printer, 44 U.S.C. Sec. 301 (1982), and the Architect of the Capitol, 40 U.S.C. Sec. 162 (1982). Thus, the manner of appointment cannot be dispositive.
 
 
 [3]
 In The Interdependence of Legitimacy: An Introduction to the Meaning of Separation of Powers, 5 Seton Hall L.Rev. 435 (1974), Judge Gibbons develops the thesis that the three branches were not intended to work in isolation and that a more accurate portrayal of the system is one of dispersed but shared decisional responsibility in which at least two branches must always concur, thus providing reasonable protection against the tyrannical exercise of power by a single branch. On this theory it is not necessary to invent a fourth branch to remedy overlap in the scheme. Judge Gibbons also gives several examples, both early and recent, of how the system of separated powers protects individual liberties
 
 
 [4]
 At least the executive need not fear for its ability to extract itself from an exigent circumstance, e.g., a contract dispute that would threaten a vital defense contract in time of national emergency, or an environmental hazard or natural disaster
 
 
 [5]
 For example, it is conceivable, albeit unlikely at this late date, that someone might launch a separation of powers challenge to the adjudicatory procedures of the NLRB. Under my analysis, a court would consider the legislative history of the NLRB to determine to which branch it was intended to belong. Presumably, the answer would be that it belongs to the executive branch. Next, the court would consider whether its adjudicatory procedures were executive in nature, and would presumably conclude that they were not, but were rather, judicial. Finally, the court would ask whether this exercise by the executive branch of judicial functions gave the executive so much power, or so intruded upon the vital functions of the judiciary, that individual liberties were threatened. In making this inquiry, the court would consider (i) how much power the President has over the NLRB's adjudicatory functions, and (ii) whether the functions are a significant intrusion upon the judiciary, or whether, on account of judicial review of NLRB decisions, the intrusion is not severe. This analysis suggests, I believe, that my approach would not eclipse the contemporary regulatory scheme