**SAMSON TUG & BARGE COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**Civ. A. No. 88–1885–LFO.**

United States District Court, District of Columbia.

Aug. 10, 1988.

Supplemental Memorandum Aug. 12, 1988.

Richard D. Gluck, Stephen P. Flott, Lane & Mittendorf, Washington, D.C., for plaintiff.

George P. Williams, Asst. U.S. Atty., Judiciary Center, Washington, D.C., for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

This matter is before the Court on plaintiff's motion for a preliminary injunction, which has been the subject of extensive briefs and oral argument.

Plaintiff, Samson Tug & Barge Company, Inc., is a corporation which, until July 1, 1988, engaged in the transportation of military cargoes between Seattle and Tacoma, Washington, and the U.S. Naval Station at Adak, Alaska, pursuant to a February 1, 1986 shipping contract with the Military Sealift Command ("MSC") of the U.S. Navy. MSC Contract No. N0003386C8503. That contract provided by its terms that it would remain in force until June 30, 1988, "and thereafter until terminated." *Id.* at 1. If the contract remained in force beyond June 30, 1988, the "TERMS AND CONDITIONS as of 30 June 1988 ... apply." *Id.* On March 31, 1988, MSC notified Samson that the February 1, 1986 contract for service to Adak would be terminated in favor of a "contract for a definite period." Letter from George Rieber to Samson Tug & Barge dated March 31, 1988. The notice further stated that "[i]n no way is this action intended to reflect dissatisfaction with your performance ... on the contrary, your performance has been satisfactory." *Id.*

Meanwhile, on March 30, 1988, MSC issued a request for proposals for a new two-year contract for service to Adak, with bids set aside for small business (i.e. businesses that together with affiliates and joint ventures had fewer than 500 employees). Plaintiff, C.C.C. Georgia, Inc. ("C.C.C.") and Alaska Tug & Salvage, Inc. ("Alaska Tug") responded. On about May 13, 1988, MSC advised Samson that the Adak contract would be awarded to C.C.C. Samson protested, invoking a regulation that postponed any award of a contract set-aside for small businesses for 10 days to enable the Small Business Administration ("SBA") to make a size determination. 48 C.F.R. § 19.302(h)(1). Samson's protest of C.C.C.'s bid advised the contracting officer that Samson was in a position to carry on the Adak service until the size protest was resolved. However, on June 8, 1988, before the SBA acted or the protest was otherwise resolved, MSC advised Samson that C.C.C. had withdrawn its bid, and that MSC had decided to let the contract to Alaska Tug. In response, on that same day, Samson confirmed its willingness to continue on an interim basis. By letter dated June 14, 1988, Alaska Tug informed the contracting officer that it would not accept the Adak award until it received formal confirmation from MSC and SBA that its offer qualified on all scores, but that if its status was confirmed by June 24, it could begin receiving cargo on July 14, 1988.

There ensued a flurry of activity. On June 15, Samson made an oral protest that Alaska Tug was also ineligible for small business set-asides because it planned to perform the contract as a *de facto* joint venture with Sea–Land Service, Inc. and Crowley Transportation, Inc. On June 16, Samson confirmed its protest in writing and challenged other elements of the Alaska Tug bid. By letter dated June 16, Alaska Tug advised the contracting officer that it would have to know by June 22 whether the contract would be awarded. On June 17, Samson protested the award to the General Accounting Office ("GAO"). On that same day, after learning that SBA could not complete its size determination by June 22, MSC awarded the contract to Alaska Tug. On June 20, the SBA Regional Office notified MSC and Samson that it expected to complete its size determination by July 1, 1988. On June 23, Samson reiterated its willingness to extend its contract beyond June 30 and reminded MSC of its obligations under 31 U.S.C. § 3553(d). That section permits a contracting officer to allow performance of contract protested to GAO only if "[t]he head of the procuring

activity responsible for award of [the] contract" determines and reports to GAO:

(i) that performance of the contract is in the best interests of the United States; or

(ii) that urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest.

On July 8, 1988, MSC made a finding that it is in the best interest of the United States to continue performance by Alaska Tug in order to assure continued service to Adak, Alaska. A few days later, on July 14, 1988, SBA determined that Alaska Tug is not a small business.

According to MSC, the contracting officer determined that extending the Samson contract beyond June 30 would have constituted a new procurement on less than full and open competition when there was at hand a valid competitive offer from Alaska Tug capable of acceptance. He was also concerned that if he did not acquiesce in Alaska Tug's demand for a definite commitment by June 22, it would withdraw, as had other contractors. As a consequence, MSC would have to pay a higher price to the next bidder. The contracting officer further determined that failure to award a contract immediately to Alaska Tug, despite the protests to the SBA, would result in disruption of service to Adak and have an adverse impact on Alaska Tug and future small business set-asides in the industry. For these reasons the contracting officer concluded that it was in the best interest of the government to award the contract prior to a decision by the SBA. According to MSC "[d]ue to an administrative oversight," it was July 8 before the head of MSC got around to making a written determination and finding and informing GAO that it was not in the best interests of the United States to suspend performance by Alaska Tug. This determination emphasized that if the Alaska Tug contract were suspended, there would be a break in the resupply of the Naval Air Station at Adak which would adversely impact the ability of the base to perform its mission and the quality of life for military personnel and their dependents. There was no meaningful statement about the availability of continued service by Samson; it was no more than mentioned.

MSC urges that the decision to award the contract while there was a protest pending before the SBA was permissible because "the contracting officer determine[d] in writing that an award must be made to protect the public interest." 48 C.F.R. § 19.302(h)(1). It also urges that the decision not to suspend the contract after the protest to GAO was permissible because (albeit after the fact) "performance of the contract [was] in the best interests of the United States," 31 U.S.C. § 3553(d), so that the decision was essentially unreviewable according to 5 U.S.C. § 701(a)(2) and the principles established in *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). Even if these decisions were reviewable, MSC argues, they were not arbitrary, capricious, or unlawful decisions about a partially performed contract.

As reluctant as courts must be to disturb decisions of contracting officers, particularly in the area of military procurement, it is highly likely that this matter will be resolved on the merits against MSC and in favor of Samson. MSC appears to have overlooked or deliberately ignored the provision of its contract with Samson that permitted it to continue to perform past June 30, 1988. This leaves the contracting officer's concern about the immediate necessity of a new procurement completely without foundation.

The hearing on the pending motion established, without dispute, that Samson was positioned to carry on without interruption. By contrast, Alaska Tug, even before its failure to qualify as a small business·was exposed, was equivocating about whether it could maintain the service theretofore provided by Samson unless it could be assured of a contract by June 22, a date by which it was manifestly impossible for either SBA or GAO to rule on the Samson protests. MSC need not have submitted to that kind of pressure. It is therefore highly likely

that when this matter is addressed on the merits, the MSC's failure to consider the availability of continuing Samson's service to allow SBA and GAO sufficient time to address what has proven to be Samson's meritorious protests was arbitrary, capricious, and contrary to law.

The injury suffered and threatened to Samson by MSC's failure to extend its contract while leaving the Alaska Tug contract in place is, and would continue to be, irreparable. At the hearing it was established that Samson has assets in place at Adak that will be either scrapped or removed at great cost if it is unlawfully deprived of an opportunity to compete against *bona fide* small businesses for the opportunity to continue the service.

The injury to MSC from a preliminary injunction setting aside the Alaska Tug contract will be relatively insignificant so long as Samson remains in a position to continue the service pending further developments. The injunction will be conditioned upon its renewed representation that it can and will do so.

The public interest in the maintenance of the Naval Station and its personnel will not be impaired, and the public interest evidenced by Congress's enactment and re-enactment of the Small Business Act will be enhanced if performance of the small business contract by a large joint venture is enjoined.

While this motion was pending, defendant moved to dismiss pursuant to Fed.R. Civ.P. 19(b) on the ground that Alaska Tug is an indispensable party that cannot be served. In support of its motion to dismiss, defendant cites 28 U.S.C. § 1391(e), as amended in Pub.L. No. 94–574 (1976). However, it is apparent from the face of the 1976 amendment and the legislative history that while it authorized joinder of a private defendant in a suit against the government under the Administrative Procedure Act, it plainly did not make that defendant a necessary party. *See* H.R. Rep. No. 94–1656, 94th Cong. 2d Sess. at 18–19 (1976), U.S.Code Cong. & Admin. News 1976, pp. 6121, 6138–6140. Indeed, the statute on its face invokes the Federal Rules of Civil Procedure. It made no exception to, or change in, Rule 19(b).

Analysis of the circumstances as contemplated by Rule 19(b) does not require dismissal. Alaska Tug would, of course, be prejudiced by an injunction against performance of its contract, although that prejudice may be completely diluted because it will prove to be ineligible as determined by SBA. Nor is there any apparent way to minimize whatever prejudice survives the SBA determination. It is clear, however, that, as between plaintiff and defendant, the relief will be adequate. There is also the possibility that Alaska Tug could have intervened in the proceedings here. Recognizing that it had no duty, it obviously has the privilege, to do so. Nor would intervention appear to pose a burden on Alaska Tug in light of the fact, noticed judicially, that Alaska Tug's joint venturer, Sea–Land, has litigated many times in this and other jurisdictions.[1] Moreover, although plaintiff could have relief by bringing suit where Alaska Tug could be served, it cannot be said in equity and good conscience that the action should be dismissed on account of prejudice to Alaska Tug when its eligibility is so patently fragile.

Neither *B.K. Instrument, Inc. v. United States,* 715 F.2d 713 (2d Cir.1983), nor *Naartex Consulting Corp. v. Watt,* 722 F.2d 779 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984), requires a contrary result. *B.K. Instrument* was remanded for just the kind of Rule 19(b) analysis which has been conducted here. In *Naartex,* where non-government defendants were outside the jurisdiction but were the target of damages claims, the Court of Appeals approved the District Court's exercise of its discretion. Both cases recognize that decisions wheth-

---

1. A LEXIS search conducted on August 10, 1988, revealed 102 cases in which Sea–Land has been a party in federal district courts around the country, including 9 cases in the United States District Court for the District of Columbia. Indeed, in *Pennsylvania v. Federal Maritime Comm'n,* 392 F.Supp. 795 (D.D.C.1975), Sea–Land Services, Inc., intervened as a party-defendant.

er or not to dismiss a case under Rule 19(b) reside primarily in the discretion of District Court judges. Evaluating the factors set forth in Rule 19(b), it is clear that "in equity and good conscience the action should proceed."

Accordingly, the accompanying Order will grant Samson's motion for a preliminary injunction and bar MSC's performance of the contract with Alaska Tug pending a decision on the merits.

## ORDER

For the reasons stated in the accompanying Memorandum, it is this 10th day of August, 1988, hereby

ORDERED: that plaintiff's motion for preliminary injunction should be, and is hereby, GRANTED; and it is further

ORDERED: that defendant's motion to dismiss should be, and is hereby, DENIED; and it is further

ORDERED: that, pending further order of the Court, defendant United States of America acting by and through the United States Navy Military Sealift Command ("MSC") be, and it hereby is, ENJOINED from performing that certain contract for transportation services between Seattle/Tacoma, Washington and Adak, Alaska awarded by MSC to Alaska Tug and Salvage, Inc. (Alaska Tug) under Request for Proposals No. N0003388R8503 on or about June 17, 1988; and it is further

ORDERED: that this Order shall apply with respect to all Adak, Alaska destined MSC cargo not received and shipped through the Tacoma, Washington port facility being used by Alaska Tug as of its sailing on Saturday, August 20, 1988; and it is further

ORDERED: that, assuming that the contracting officer now has the same authority to extend contract number N0003386C8503 that he had before June 30, 1988, defendant shall, at 11:30 a.m. on August 12, 1988, show cause, if any there be, why that contract with plaintiff should not now be extended at the terms and conditions existing as of June 30, 1988, until a new contract is awarded under Request for Proposals No. N0003388R8503 in compliance with all applicable laws and regulations.

## SUPPLEMENTAL MEMORANDUM

The February 1, 1986 contract was to "remain in force for 29 months ... and thereafter until terminated." MSC Contract No. N0003386C8503. On March 31, 1988, the contracting officer advised plaintiff that "[t]here appears to be potential competition for service in the Seattle/Adak trade." Letter from George Rieber to Samson Tug & Barge. He

consider[ed] it desirable to provide service to Adak under a contract for a definite period rather than contract for a [sic] indefinite basis. Accordingly, this letter is considered as notice of termination of service upon expiration of this contract period [June 30, 1988]. It is intended that MSC will issue an RFP for such service in the near future.

*Id.* Thereafter, in late June 1988, the contracting officer, faced with a virtual ultimatum from Alaska Tug to contract with it before either the Small Business Administration ("SBA") or the Government Accounting Office ("GAO") could rule on Alaska Tug's status as a small business, with the alternative of extending the contract with plaintiff, refused to extend the contract with plaintiff and committed to a new contract with Alaska Tug. For the reasons stated in the August 10, 1988 Memorandum, those decisions and actions will probably be determined to be null and void.

Defendant argues that the issue of relief is complicated by the March 31, 1988 termination of the Samson–MSC contract. It argues that the parties cannot now re-enter a terminated contract. The argument, however, is overly formalistic and cannot defeat plaintiff's motion for a preliminary injunction. Even at the preliminary injunction stage, it is highly probable that the government's termination of the contract will be held to be unlawful. The contracting officer should not have awarded the Adak contract to Alaska Tug until the SBA had made its size determination. At the time when this decision was made, the

Samson contract was still in force and was, by its own terms, extendable beyond its June 30, 1988 expiration date. Thus, the "flip side" of the government's decision to award the Alaska Tug contract was a decision to refuse to extend the Samson contract, which is also highly likely to be held to be arbitrary and capricious. If the government had properly deferred the Alaska Tug contract until the SBA, and possibly the GAO, had ruled, the SBA's decision disqualifying Alaska Tug would, for ought that appears, have required extension of the Samson contract in order to avoid any disruption of the Adak shipments. *Cf. Universal Shipping Co., Inc. v. United States*, 652 F.Supp. 668, 670 (D.D.C.1987).

Hence, in order to award relief that will maintain the *status quo* and place the parties in approximately the positions they occupied before the decisions that are likely to be found unlawful, the Samson contract should be extended—at least until the contracting officer can establish a new, fair means of awarding the Adak contract in accordance with all applicable rules and regulations, including the Small Business Act—as it would have been had the government not acted in a manner likely to be found to be unlawful. There is sound precedent for such relief. *See id.*, 652 F.Supp. at 676.