**DAIRY MAID DAIRY, INC., Plaintiff,**

v.

**The UNITED STATES of America and The United States Department of the Army and John W. Shannon, Acting Secretary of the Army, Philip A. Grace, Contracting Officer, United States Army Korea Contracting Agency, Defendants.**

Civ. No. 2:93CV260.

United States District Court,
E.D. Virginia,
Norfolk Division.

Nov. 5, 1993.

Michael L. Sterling, Howard W. Roth, III, Vandeventer, Black, Meredith & Martin, Norfolk, VA, for plaintiff.

J. Phillip Krajewski, Asst. U.S. Atty., Norfolk, VA, for defendants.

## MEMORANDUM OPINION AND ORDER

PAYNE, District Judge.

Dairy Maid Dairy, Inc. ("Dairy Maid") filed this action seeking declaratory and injunctive relief as the consequence of alleged violations of the Competition in Contracting Act ("CICA") by the United States Army (the "Army"). Following an evidentiary hearing and upon consideration of the affidavits and pleadings, the court entered a temporary restraining order. Upon agreement of the parties, the trial of the action on its merits was advanced and consolidated with the hearing on Dairy Maid's application for preliminary injunctive relief, *see* Fed. R.Civ.P. 65(a)(2). After reviewing the affidavits, the exhibits, the testimony presented at trial and the briefs and arguments of counsel, the court issued an order on April 13, 1993 deciding the case on the merits and granting permanent injunctive relief. The reasons supporting that decision and order are set forth fully below.

## STATEMENT OF FACTS

This action arises out of the solicitation, award and resulting protests of a contract for the operation of the Eighth U.S. Army Milk Plant, located at the K-16 Air Base, Songnam, Republic of Korea. The milk plant is a

Government Owned–Contractor Operated ("GOCO") facility. As its name implies, the facility is owned by the Army and, pursuant to contract, the contractor is obligated to operate the milk plant, to maintain the operating equipment and to produce and deliver milk and other dairy products for consumption by United States military personnel and their dependents. By law, the contract must be awarded to an American company, but the milk plant is actually operated by a staff of approximately 75 Korean nationals who work under the supervision of the contractors' American employees.

The milk plant is the only source in the Republic of Korea of veterinary-approved milk and other dairy products for 61 dining facilities used by United States military personnel and by Army civilian employees. It also is the sole source of supply of milk and other dairy products to Army hospitals, the enlisted and officer club systems, the military exchange outlets and the schools operated for dependents of military personnel. It is undisputed that there are no approved local dairies in the Republic of Korea which could constitute an alternate source for milk and dairy products. It is also undisputed that supplies of extended shelf life milk from the continental United States are not available in quantities sufficient to meet demand.

### The Historical Setting for the Current Dispute

At the time this action was filed, Dairy Maid was operating the milk plant under contract no. DAJB03–92–C–3216 (the "3216 Contract") which originally was to expire on September 30, 1992, but was extended twice by mutual agreement. Before the 3216 Contract was awarded to Dairy Maid, the milk plant was operated by Contact International, Inc. ("CIC") under contract no. DAJB03–89–C–1001 (the "1001 Contract").

Near the end of the 1001 Contract, CIC and Dairy Maid competed for award of the 3216 Contract and, after the 3216 Contract was awarded to Dairy Maid, CIC filed a protest with the Comptroller General of the United States ("GAO") under 31 U.S.C. § 3552 (Supp.1993). As required by 31 U.S.C. § 3553(c)(1), the award of the 3216 Contract to Dairy Maid was stayed pending a decision by the GAO on CIC's protest. In order to maintain the status quo and an uninterrupted supply of milk and other dairy products, CIC and the Army mutually agreed to extend the 1001 Contract until the GAO decided the merits of CIC's protest of the 3216 Contract. In fact, the 1001 Contract, the terms and conditions of which are the same as the 3216 Contract insofar as they pertain to contract extensions, previously had been extended by mutual agreement three times.

### The 0002 Solicitation and Protests

On November 23, 1992, the Army issued solicitation no. DAJB03–93–R–0002 ("0002 Solicitation") for a follow-on contract to the 3216 Contract. In December 1992, Dairy Maid filed two protests of the 0002 Solicitation, alleging numerous defects therein. Those protests were consolidated and set for hearing on their merits by the GAO. However, by letter dated January 21, 1993, the Army requested dismissal of the consolidated protests as moot because the Army had considered the protests and taken corrective action. In requesting this disposition of Dairy Maid's consolidated protests, counsel for the Army advised the GAO to:

> Please obtain dismissal of subject protest. USACCK has extended the solicitation closing date, as Protestor [Dairy Maid] requests, and is substantially revising the solicitation. We will take into account all of Dairy Maid's criticisms.... *[w]e will negotiate with Dairy Maid a six-month extension to allow for amendment, re-preparation of proposals, audit, negotiations, award, and phase-in.* (emphasis added)

In response to the Army's request, GAO dismissed as moot Dairy Maid's consolidated protests of the 0002 Solicitation. Having received copies of the communications between the Army and the GAO, counsel for Dairy Maid advised the Army's contracting officer in Korea by letter dated January 22, 1993, that "[w]e understand from Mr. Wilder's correspondence that it is the Government's intention to negotiate a six-month extension to our existing contract and look forward to cooperating with your office in this regard."

Subsequently, by letter dated January 28, 1993, Phillip A. Grace, the Army's contracting officer in Korea, advised Dairy Maid that the government was prepared to extend the 3216 Contract by mutual agreement through September 30, 1993, and solicited a proposal from Dairy Maid. Dairy Maid responded on February 11, 1993, by submitting two alternate proposals for a six-month contract extension.

On the same day, CIC entered the picture and informed the head of the government contracting agency in Korea that "[w]e understand that it is the Government's desire to award a contract for operation of the K–16 Milk Plant for the period of 01 April 1993 through 30 September 1993." CIC expressed its willingness and readiness to perform the required work and requested that a contract be awarded to it on a "sole source basis or alternatively on the basis that under 10 U.S.C. § 2304(c)(2), the Army could limit procurement solicitation to one firm when the government reasonably determined that only that firm could properly perform the work in the available time."

On February 16, 1993, five days after submitting the proposals solicited by the Army on January 28, Dairy Maid received a letter from Mr. Grace, stating that a new solicitation, which would be identical to the 0002 Solicitation except as to the provisions governing duration of the contract and the guaranteed minimums, was being issued for a six-month extension of the 3216 Contract. Dairy Maid was requested to prepare a proposal by February 26, 1993. Confused by these developments and by the inconsistent instructions from the Army, Dairy Maid's counsel posed six questions to the contracting officer by letter dated February 18, 1993. One of those inquiries asked whether the government intended to negotiate with Dairy Maid a six-month extension to the 3216 Contract. The Army responded to that inquiry on February 25, 1993, stating that:

It was the Government's desire to negotiate for a six-month extension to the current contract. However, the Government is now able to obtain competitive prices under solicitation DAJB03–93–R–0002 in compliance with procurement regulations.

Therefore an extension to the current contract for six months may not be necessary.

### The 0072 Solicitation

On February 23, 1993, Dairy Maid received solicitation DAJB03–93–R–0072 (the "0072 Solicitation," which subsequently became the "0072 Contract"). The next day, Dairy Maid filed a protest with the GAO challenging numerous improprieties and defects in the 0072 Solicitation. The Army partially revised the 0072 Solicitation by letter dated March 16, 1993, and, on March 19, 1993, the next government working day, the Army responded to Dairy Maid's challenges to the 0072 Solicitation with a limited clarification. On March 22, 1993, Dairy Maid informed the contracting officer that, as a consequence of the Army's amendment of the 0072 Solicitation, Dairy Maid would require ten working days to reprice its proposal.

### The 0072 Protests and The Stays Here At Issue

The filing of a timely protest of the 0072 Solicitation, automatically stays an award of the 0072 Contract pending resolution of the protest by the GAO, unless the head of the procuring activity decides to override the stay after making a written finding pursuant to 31 U.S.C. § 3553(c)(2) that:

urgent and compelling circumstances which significantly affect interests of the United States will not permit waiting for the [GAO decision on the merits of the protest].

On March 19, 1993, Major General Scott, the head of the procuring agency, acting pursuant to staff recommendations dated March 18, 1993, and March 17, 1993, decided to override the automatic pre-award stay and award the 0072 Contract to CIC. The stated basis of General Scott's determination was that "... delay in awarding a contract shall have a devastating impact on all dining facilities in Korea as well as on hospitals, club system, and AAFES." This conclusion was based on the fact that the milk plant was the sole source of supply of important dairy products. General Scott's determination did not address the potential availability of Dairy Maid to continue performance of the contract pending a decision by the GAO on Dairy

Maid's protest. Nor did the determination explain why the Army could not extend the 3216 Contract as it had when CIC protested the award of the 3216 Contract, and the Army extended the 1001 Contract to allow CIC to continue operation of the milk plant while its protest of the award of the 3216 Contract was pending before GAO. On March 22, 1993, the Deputy Secretary of the Army signed the document authorizing the override of the automatic stay.

On March 23, 1993, Dairy Maid received a copy of a letter from the contracting officer announcing that the 0072 Contract had been awarded to CIC, notwithstanding that CIC's contract price for the first six-month period of the contract exceeded the price that would be obtained under the 3216 Contract if it were extended pending resolution of Dairy Maid's pre-award protest of the 0072 Solicitation. The next day, Dairy Maid filed a post-award protest with GAO challenging the award of the 0072 Contract to CIC. Dairy Maid requested that the award and performance of the contract to CIC be stayed pending a decision by GAO on the protests, and also offered to continue to supply milk and dairy products under the terms of the 3216 Contract until the protests were resolved.

Upon receipt of Dairy Maid's timely post-award protest, the Army was obligated under 31 U.S.C. § 3553(d)(1) to direct CIC to suspend performance of the 0072 Contract and to refrain from engaging in any related activities that might result in additional obligations being incurred by the government pending resolution of Dairy Maid's post-award protest, unless the head of the procuring activity decided to override the stay by making a written finding pursuant to 31 U.S.C. § 3553(d)(2)(A)(ii):

> that urgent and compelling circumstances that significantly affect interest of the United States will not permit waiting for the decision of the Comptroller General concerning the protest. . . .

No such determination was made.

Dairy Maid instituted this action challenging the Army's decision to override the pre-award protest of the 0072 Solicitation and seeking to enjoin the Army's action in proposing to allow CIC to proceed with the 0072 Contract without making the requisite finding under CICA to override the automatic stay pending resolution of the post-award protest. For the reasons set forth below, the court finds that Dairy Maid's challenges to the Army's conduct are well-taken and that Dairy Maid is entitled to permanent injunctive relief.

## STANDARD AND SCOPE OF REVIEW

The parties agree that the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, governs judicial review of the Army's decision to override CICA's automatic stay provisions respecting the pre-award challenge to the 0072 Solicitation and the Army's decision to allow CIC to perform the 0072 Contract notwithstanding the Army's failure to comply with the post-award stay provisions. The parties also agree that the applicable standard of review is defined by 5 U.S.C. § 706(2)(A) which provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . ."

Under this standard, the scope of judicial review is narrow. As recently explained by the United States Court of Appeals for the Fourth Circuit:

> In determining whether agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" . . . we perform "only the limited, albeit important, task of reviewing agency action to determine whether the agency conformed with controlling statutes" . . . and whether the agency has committed a clear error of judgment. . . . "[T]he ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."

*Maryland Dep't of Human Resources v. Department of Agric.*, 976 F.2d 1462, 1475 (4th Cir.1992) (citing *Baltimore Gas & Elec. Co. v. NRDC, Inc.*, 462 U.S. 87, 97, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983), *Citizens To Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136

(1971), and *Duke Power Co. v. NRC,* 770 F.2d 386, 390 (4th Cir.1985)). The reviewing court, of course, "should make a 'searching and careful' inquiry of the record to ascertain whether the agency action 'was based on a consideration of the relevant factors....'" *Duke Power Co. v. NRC,* 770 F.2d 386, 390 (4th Cir.1985) (citing *Citizens To Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823).

■ The scope of judicial review in cases challenging the decisions of government procurement officials is particularly limited, because in order to prevail under § 706(2)(A), "'a disappointed bidder must show either (1) that the decision of the procurement official had no rational basis, or (2) that the decision involved a clear and prejudicial violation of the applicable statutes or regulations.'" *Shoals Am. Ind., Inc. v. United States,* 877 F.2d 883, 887 (11th Cir. 1989) (citing *Choctaw Mfg. Co., Inc. v. United States,* 761 F.2d 609, 616 (11th Cir.1985)). Furthermore, injunctive relief is warranted in government procurement cases only where there has been more than a mere technical violation of the applicable statutes or regulations. *Motor Coach Indus., Inc. v. Dole,* 725 F.2d 958, 968 (4th Cir.1984).

## DISCUSSION

■ CICA "was enacted to remedy a major loophole in the longstanding GAO [procurement] review procedure: by the time the GAO reviewed most bid protests, the protests had become moot because either the contract had been let or the contractor was engaged in performing the contract." *Ameron, Inc. v. United States Army Corps. of Engrs.,* 787 F.2d 875, 878 (3d Cir.1986). Congress enacted CICA, and incorporated the stay provisions here at issue, in an attempt to provide effective and meaningful review of procurement challenges before the protested procurements become *"faits accomplis." Id.* at 879. For this reason, the

filing of a protest with GAO automatically stays the award or performance of the challenged contract until (1) the GAO decides the protest on the merits, or (2) the head of the procuring activity or agency certifies in writing that the statutory requirements for overriding the stay have been met. 31 U.S.C. § 3553; *Ameron, Inc.,* 787 F.2d at 879.

The statutory requirements for overriding a stay pending resolution of a pre-award protest differ from the requirements for overriding a stay pending resolution of a post-award protest. *Compare* 31 U.S.C. § 3553(c)(2) *with* 31 U.S.C. § 3553(d)(2). In order to override an automatic stay pending resolution of a pre-award protest, the head of the procuring activity must make "a written finding that urgent and compelling circumstances which significantly affect interests of the United States will not permit waiting for the [GAO decision on the merits of the protest]." 31 U.S.C. § 3553(c)(2). An automatic stay pending resolution of a post-award protest may be overridden only if the head of the procuring activity makes a written finding:

(i) that performance of the contract is in the best interests of the United States; *or*

(ii) that urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of [GAO] concerning the protest; ...

31 U.S.C. § 3553(d)(2) (emphasis added). Although these statutory requirements are substantially similar, the "best interests of the United States" factor only comes into consideration in situations where the procuring agency is seeking to override a post-award stay.[1]

Thus, except in those circumstances where a stay is properly overridden, CICA preserves the status quo by preventing the

---

1. It has been held that an agency decision that "performance of the contract is in the best interests of the United States" is not susceptible to judicial review because it constitutes an agency action that is committed to agency discretion by law. *See, e.g., Topgallant Group, Inc. v. United States,* 704 F.Supp. 265, 266 (D.D.C.1988); *see* *also* 5 U.S.C. § 701(a)(2). The court need not address this issue because the Army failed to make *any* finding under 31 U.S.C. § 3553(d)(2), let alone a finding that performance would be in the best interests of the United States, before overriding the automatic stay pending resolution of Dairy Maid's post-award protest.

award or performance of a challenged government contract until after the GAO has resolved the merits of any protests concerning that contract. Further, CICA is clear in what findings must be made in order to justify a departure from the norm established by the stay requirements.

Mindful of this statutory framework, of the congressional purposes for enacting CICA and of the applicable standard of review, the court now considers the Army's decision to override the automatic stay pending resolution of Dairy Maid's pre-award protest of the 0072 Solicitation and the Army's decision to allow performance of the 0072 Contract without overriding the automatic stay pending resolution of Dairy Maid's timely protest of the award of the 0072 Contract to CIC.

### I. The Pre–Award Protest

The Army's position is that it made the requisite finding under 31 U.S.C. § 3553(c)(2) before overriding Dairy Maid's pre-award protest and awarding the 0072 contract to CIC. Dairy Maid asserts that the Army's finding did not comport with the statutory requirements or the decision interpreting the statute. After reviewing the administrative record and the applicable decisions, the court concludes that the Army failed to make the requisite statutory findings, and that therefore the Army's decision to override Dairy Maid's pre-award protest was arbitrary, capricious and not in accordance with law.

As required by 31 U.S.C. § 3553(c)(2)(A), the Army issued on March 19, 1993 a written "Determination and Findings" ("D & F") setting forth its rationale for lifting the stay of the award of the 0072 contract to CIC. The D & F and its supporting documents comprise the record to be examined in determining whether the Army's findings satisfied the requirements of the statute. The D & F noted a number of reasons why the continued production of milk at the facility was of critical importance, and carefully explained that there were no means of supplying the Army's requirements for dairy products if the plant was not operating. Having fully and adequately documented those findings, which are not disputed, the Army concluded that there existed urgent and compelling circumstances which significantly affected the United States, and that, accordingly, there should be an override of the stay imposed by Dairy Maid's protest.

The D & F did not explain, however, why the award of the 0072 Contract could not abide the resolution of Dairy Maid's protest by the GAO. The statute is clear that the automatic stay must not be overridden unless there is a finding that urgent and compelling circumstances which are found to significantly affect the interests of the United States "will not permit waiting" for the GAO's decision on the protest. This language requires that the Army must find: (1) the existence of urgent and compelling circumstances; (2) that those circumstances significantly affect the United States; and (3) that those circumstances are such as to preclude waiting for the procedure prescribed by statute to run its course. The decision to override a stay must be based on all three components set by the statute. If not, the decision is defective.

Here the Army did not explain why, under the circumstances of this case, award of the 0072 Contract could not await a decision by the GAO. This defect is extremely significant where, as here, the history of the administration of the contract respecting operation of this plant was replete with instances of contract extensions and reflected that the Army in fact had previously stayed the award of a virtually identical contract under substantially similar circumstances. The Army's findings completely ignored the availability of Dairy Maid to continue production under the terms of the 3216 Contract while its protest was pending before the GAO. In like fashion, the Army did not explain why it considered performance by CIC, rather than Dairy Maid, to have been essential. These factors are both among the circumstances which must be considered under the facts of this case if the requirements of the statute are to be satisfied.

Several courts have held that CICA requires the agency to explain why performance by a specific proposed contractor presents urgent and compelling circumstances, and that it is insufficient for the

agency to rely solely on the fact that performance of the contract itself is urgent and compelling. *D.T.H. Management Group v. Kelso*, No. 93–439–CIV–5–D (E.D.N.C. Aug. 4, 1993) (Dupree, J.) (granting preliminary injunction to current contractor where D & F failed to explain why specific contractor was required to do job); *Ace Fed. Reporter v. Federal Energy Regulatory Comm'n*, No. 90–2396, 1990 U.S.Dist. LEXIS 13823, at *11–*12 (D.D.C. October 16, 1990) (Penn, J.) (granting preliminary injunction in favor of current contractor to stay performance until resolution of a pending protest because agency's failure to consider fact that current contractor was able to perform contract in interim before GAO's determination was contrary to purpose of the CICA to preserve *status quo*); *Samson Tug & Barge Co. v. United States*, 695 F.Supp. 25, 29 (D.D.C.1988) (Oberdorfer, J.) (granting current contractor's motion for a preliminary injunction because agency's failure to consider the availability of continuing its services while the GAO decided protest was likely to prove arbitrary, capricious and contrary to law); *Universal Shipping Co. v. United States*, 652 F.Supp. 668, 675–76 (D.D.C.1987), (Richey, J.) (granting permanent injunction in favor of current contractor and staying award of contract until resolution of pending protest before GAO because agency's failure to consider ability of contractor to continue services in interim in determining whether to lift stay was not rational or reasonable).

The underlying rationale of these decisions is that CICA requires the agency to make findings that performance of the contract by the particular proposed contractor is urgent and compelling. They also instruct that adopting the contrary view, which is what the Army proposes here, "would eviscerate the purpose and effect of the stay provision of the CICA because performance of almost any government contract could conceivably be deemed 'urgent and compelling circumstances.'" *D.T.H. v. Kelso*, (slip op. p. 11). Indeed, the Army's interpretation would allow the exception for lifting the automatic stay provided in 31 U.S.C. § 3553(c)(2)(A) to swallow the general provision in 31 U.S.C. § 3553(c)(1) imposing an automatic stay

pending resolution of the protest on its merits.

The Army has argued that at one point in its contract discussions in February, Dairy Maid threatened not to perform the contract in an attempt to coerce the Army into terminating an investigation into Dairy Maid's business practices. Had the Army been able to prove this allegation, it might have been sufficient to support a finding that performance by CIC was necessary and hence that an award to CIC could not await the GAO's decision. However, the evidence clearly showed that Dairy Maid made no such threat. Indeed, the letter from Dairy Maid to the Army dated February 8, 1993, merely stated: (1) until the Army's investigation of Dairy Maid was resolved, Dairy Maid was "reluctant to submit an extension proposal;" and (2) until Dairy Maid received answers to all the questions Dairy Maid had raised to the Army in a previous letter, Dairy Maid could not submit any extension proposal. Moreover, Dairy Maid's contemporaneous conduct belies the Army's assertion because the undisputed record reflects that Dairy Maid submitted two alternate proposals on February 11, 1993. Thus, the record establishes that Dairy Maid was both willing and able to continue to supply milk and other dairy products under the terms of the 3216 Contract (which were more favorable to the Army than the terms on the 0072 Contract entered into with CIC), pending a decision by the GAO.

Taken as a whole, the record provides no rational basis for the decision to override the automatic stay. Moreover, on the facts of this record, the court finds that the decision to override the stay was a clear and prejudicial violation of the applicable law. For these reasons, the decision to override the pre-award stay was arbitrary, capricious and otherwise not in accordance with law.

## II. The Post–Award Protest

Pursuant to 31 U.S.C. § 3553(d)(1), once the Army received notice from GAO of Dairy Maid's timely post-award protest it was required to direct CIC to (1) cease performance of the 0072 contract, and (2) suspend any activities which might result in the United States incurring any additional costs. The statute provides:

If a federal agency receives notice of a protest under this section after the contract has been awarded but within 10 days of the date of the contract award, the federal agency (except as provided under paragraph (2)) *shall,* upon receipt of that notice, immediately direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by the United States under that contract. *Performance of the contract may not be resumed while the protest is pending.*

31 U.S.C. § 3553(d)(1) (emphasis added). The provisions of the statute are mandatory and hence the Army was required to direct CIC to cease performance under the 0072 Contract unless and until a finding was made pursuant to 31 U.S.C. § 3553(d)(2).

■ The undisputed record shows that the Army neither made the requisite finding under 31 U.S.C. § 3553(d)(2) nor directed CIC to cease performance of the 0072 Contract pending resolution by GAO of Dairy Maid's post-award protest. The Army asserts that it was not required to make a finding under 31 U.S.C. § 3553(d)(2), because it already had made a finding of urgent and compelling circumstances under 31 U.S.C. § 3553(c)(1) in order to override the automatic stay created by Dairy Maid's pre-award protest. This argument does not pass muster.

The Army's position is based on the Comptroller General's decision in *In re: Southern California Roofing Co.,* B–236631, 89–2 CPD ¶ 594 (December 26, 1989). In that case, the Comptroller General held that when a post-award protest merely reiterated positions advanced in a pre-award protest which had been properly overridden, it was not necessary for the procuring activity to make a new finding of urgent and compelling circumstances to override the stay imposed by the post-award protest. The reasoning of that case is not persuasive for two reasons. First, *Southern California* is factually distinguishable from this action because Dairy Maid's post-award protest advances positions and arguments which were not asserted in its consolidated pre-award protests. In fact, Dairy Maid advanced arguments in its post-

award protest, such as its assertion that CIC's bid was unbalanced, which could not have been raised until *after* the 0072 Contract was awarded to CIC. Second, *Southern California* reads into the clearly mandatory language of 31 U.S.C. § 3553(d) an exception to the requirement of a finding of urgent and compelling circumstances which is not found in the text of the statute, and which, if adopted, would render 31 U.S.C. § 3553(d)(2) meaningless in all cases where a protestor files both pre-award and post-award protests.

■ In a related argument, the Army, relying on *Superior Eng'g & Elecs. Co. v. United States,* No. 86–860–N, 1987 U.S.Dist. LEXIS 7940 (E.D.Va. August 31, 1987), asserts that its failure to comply with § 3553(d)(2) constitutes a "mere technical violation" of CICA which does not justify injunctive relief. It is correct that a mere technical violation of CICA does not warrant injunctive relief. In *Superior Engineering,* a finding of urgent and compelling circumstances was made and approved by an individual other than the head of the procuring activity who, of course, is the individual statutorily required to make such a finding. The district court held that this constituted a "technical violation of the CICA and FAR," but that the violation was little more than a "procedural defect" which did not render the Navy's actions arbitrary or capricious and which did not constitute a valid basis for injunctive relief. *Superior Engineering* is inapposite because in this action the finding required by 31 U.S.C. § 3553(d)(2) was not made at all.

Considering the clear and mandatory language of 31 U.S.C. § 3553(d)(2) in light of the principal purpose for which CICA was enacted, the court finds that the complete failure to comply with the statute cannot be remedied by characterizing it as "a mere technical violation" of CICA. Rather, the Army's complete failure to comply with 31 U.S.C. § 3553(d)(2) constitutes "a clear and prejudicial violation of the applicable statutes or regulations" and, accordingly, the Army's override of the automatic stay imposed by Dairy Maid's post-award protest was arbitrary, capricious and otherwise not in accor-

dance with law. *See Shoals Am. Ind., Inc. v. United States,* 877 F.2d 883, 887 (11th Cir. 1989); 5 U.S.C. § 706(2)(A).

### III. The Prayer For Injunctive Relief

 Where, as here, the offending conduct by the government procuring activity is substantive, rather than technical, the government procurement activity can be enjoined. *See Motor Coach Ind., Inc. v. Dole,* 725 F.2d 958, 968 (4th Cir.1984). Moreover, it is generally accepted that injunctive relief is appropriate to remedy the improper lifting of a stay pending resolution of a government procurement dispute. *See, e.g., Samson Tug & Barge Co. v. United States,* 695 F.Supp. 25 (D.D.C.1988); *Universal Shipping Co. v. United States,* 652 F.Supp. 668 (D.D.C.1987); *Cf. Ameron, Inc. v. United States Army Corps. of Engineers,* 809 F.2d 979 (3d Cir. 1986).

The fact that the Army's conduct was in violation of the controlling statute does not alone entitle Dairy Maid to an injunction. Dairy Maid also must establish that it has no adequate legal remedy and hence will be irreparably injured in the absence of an injunction. Even then, the court must consider the likelihood of harm to the Army if the permanent injunction is granted, and the public interest in granting or denying the injunction.

 Dairy Maid has established that it will be irreparably harmed if an injunction is not issued, and that it does not have an adequate legal remedy. The denial of the right to have its bid fairly and lawfully considered constitutes an irreparable injury, *see, e.g., Abel Converting, Inc. v. United States,* 679 F.Supp. 1133, 1142 (D.D.C.1988), as does the loss of a major contract. *United Power Corp. v. United States Defense Mapping Agency,* 736 F.Supp. 354, 357–58 (D.D.C. 1990). "A disappointed bidder that claims illegality in a procurement alleges an injury beyond its economic loss of the contract. The disappointed bidder may also claim injury to its right to a legally valid procurement process." *National Maritime Union of Am., AFL–CIO v. Commander Military Sealift Command,* 824 F.2d 1228, 1237 (D.C.Cir. 1987) (citations omitted).

 Moreover, Dairy Maid's remedy at law is clearly inadequate. The record shows that the value of the 0072 Contract to Dairy Maid is approximately four million dollars and that the duration of the 0072 Contract is limited. Accordingly, absent an injunction, Dairy Maid will effectively lose this contract before its pending protests can be adjudicated by the GAO. However, under the applicable law, if Dairy Maid's protests are sustained its monetary damages are limited to the costs of pursuing the protest, including attorney's fees and bid preparation costs. *See Keco Indus., Inc. v. United States,* 428 F.2d 1233, 1240, 192 Ct.Cl. 773 (1970). Furthermore, Dairy Maid's protest includes an assertion that the Army was required to negotiate an extension of the 3216 Contract because of the circumstances surrounding dismissal of Dairy Maid's protests of the 0002 Solicitation. Absent an injunction, that issue will be mooted before the GAO can consider it. Under these circumstances, Dairy Maid has established that its remedy at law is inadequate and that it will suffer irreparable injury absent an injunction.

 The Army asserts that it will be harmed if a permanent injunction is issued because: (1) the supply of milk and other dairy products to its personnel and their dependents in Korea will be jeopardized; (2) it will be exposed to potential liability to CIC; and (3) the morale of the Army personnel involved in the procurement process will be adversely affected. The most serious of these asserted harms is clearly the first one, because it is undeniably critical to ensure an uninterrupted supply of milk and other dairy products to the military and civilian personnel and their dependents in Korea. However, Dairy Maid has represented to the court that it is ready, willing and able to continue to perform under the terms of the 3216 Contract pending resolution by GAO of the protests. Further, Dairy Maid has presented evidence clearly showing that it has met the demand for these products since the court entered the temporary restraining order on March 31, 1993. The court is satisfied that the needs of the Army in this respect are being adequately met by Dairy Maid and that, on the facts of this case, the Army's

apprehension of an interrupted supply of milk and dairy products is unfounded.[2]

The court accepts as true the Army's assertion that it may be exposed to some liability to CIC if a permanent injunction is granted. The record shows that this potential liability is not substantial and it certainly does not approximate the harm which would befall Dairy Maid absent an injunction.

The court does not accept the Army's argument that its commanding and procurement personnel will be demoralized if an injunction is entered. The commander relied on his procurement staff to make what he thought was a legally sufficient finding as respects the award of the 0072 Contract and in refraining from making any finding as respects the performance by CIC of the contract. Although the commander might be displeased with the performance of his staff and they might be chaffed by the criticism inherent in the court's findings, it gives all involved far too little credit to contend that they will be demoralized by an adverse decision by the court. Even if this rather far-fetched argument were accepted, it would be legally insufficient to preclude an injunction here considering the nature and consequences of the Army's violations of CICA and the harm which would befall Dairy Maid absent an injunction.

The final factor the court must consider, the public interest, also weighs in favor of granting injunctive relief in this case. Without doubt, the public interest is promoted by protecting the integrity of the government procurement process. *Scanwell Labs., Inc. v. Shaffer,* 424 F.2d 859, 866–67 (D.C.Cir.1970). Moreover, there is a strong public interest in seeing that the government follows its substantive duties under the procurement statutes and regulations. *See Motor Coach Ind., Inc. v. Dole,* 725 F.2d 958, 968 (4th Cir.1984).

In sum, the court finds that, based on the record before it and the applicable law, Dairy Maid is entitled to a permanent injunction. Although courts have wide discretion in fashioning equitable relief, *see Richmond Tenants Org. v. Kemp,* 956 F.2d 1300, 1308 (4th Cir.1992), "injunctive relief should be no broader than necessary to provide full relief to the aggrieved party." *Ameron, Inc. v. United States Army Corps. of Eng'g,* 787 F.2d 875, 888 (3d Cir.1986) (citing *Califano v. Yamasaki,* 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979)). In this case, an injunction requiring the Army to comply with the stay provisions of CICA pending resolution of Dairy Maid's pre-award and post-award protests and during the period required, if any, for the Army to comply with a GAO decision favorable to Dairy Maid provides full relief to Dairy Maid and will honor the goals CICA was enacted to achieve. To ensure that the Army's supply of milk and other dairy products continues uninterrupted during the interim period, and to maintain the status quo, the court has ordered that the current contract (the 3216 Contract) between the Army and Dairy Maid be extended on the same terms until the GAO resolves the protest and during the time required for compliance with the GAO's decision. In that regard, the court, relying on the GAO's rules of procedure, requested that consideration and decision of Dairy Maid's protests be expedited and the GAO agreed to accord those protests expedited consideration.

## IV. Dairy Maid's Request for Attorney's Fees and Costs

Dairy Maid has filed an application for attorney's fees and costs pursuant to the Equal Access to Justice Act ("the EAJA") 28 U.S.C. § 2412 (Supp.1991). The EAJA authorizes an award of reasonable attorney's fees and costs to a prevailing party in certain civil actions against the United States unless it finds that the United States' position was "substantially justified" or that special circumstances make an award unjust. 28 U.S.C. § 2412(d)(1)(A); *see also Commissioner, INS v. Jean,* 496 U.S. 154, 158, 110

---

**2.** In its pleadings and at the hearing on the application for a permanent injunction, the Army asserted that Dairy Maid's performance of the 3216 Contract had been lacking, that Dairy Maid was being investigated for fraud and that Dairy Maid's performance during the pendency of the TRO was questionable. In final argument, the Army abandoned the fraud theory and cross-examination showed convincingly that the Army's challenges to Dairy Maid's contract performance were without basis in fact.

S.Ct. 2316, 2319, 110 L.Ed.2d 134 (1990). The Army does not dispute that Dairy Maid is a prevailing party in this action within the meaning of EAJA. The Army contends, however, that Dairy Maid should not be awarded attorney's fees because the Army's position was "substantially justified."

 Under the EAJA, the Army bears the burden of justifying the positions it has taken at the agency level and in judicial proceedings. *Abernathy v. Clarke,* 857 F.2d 237, 238 (4th Cir.1988) (citing *Campbell v. Bowen,* 800 F.2d 1247, 1249 (4th Cir.1986)); *see also* 28 U.S.C. § 2412(d)(2)(D). The Supreme Court has interpreted the phrase "substantially justified" to mean that the government's position must have a "reasonable basis in law and fact." *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988) ("The phrase before us here is not 'justified to a high degree,' but rather 'justified in substance or in the main'—that is, justified to a degree that could satisfy a reasonable person."); *See also Abernathy,* 857 F.2d at 239 (citing *Pullen v. Bowen,* 820 F.2d 105, 107–108 (4th Cir.1987)). The Army cannot meet this standard merely by showing that its position was not frivolous, as defined in Rule 11 of the Federal Rules of Civil Procedure. *Pierce,* 487 U.S. at 566, 108 S.Ct. at 2550. Rather, the Army must show that its position is "for the most part" justified. *Id.* n. 2.

In this case, therefore, the Army must show that its position as to both the pre-award and the post-award protests meets this standard. The court finds that, although the Army's position as to the pre-award protest was substantially justified within the meaning of the EAJA, the Army has failed to demonstrate that its position respecting the post-award protest was reasonable in law and fact. Therefore, Dairy Maid is entitled to attorney's fees and costs.

### 1. The Pre–Award Protest

The fact that Dairy Maid has prevailed is not dispositive of whether the Army's position was substantially justified. *See Broad Ave. Laundry & Tailoring v. United States,* 693 F.2d 1387, 1391 (Fed.Cir.1982) ("The mere fact that the United States lost the case does not show that its position in defending the case was not substantially justified."). Indeed, under the EAJA standard, the Army is required only show that it had a "solid though not necessarily correct basis in fact and law" for its position. *McDonald v. Schweiker,* 726 F.2d 311, 316 (7th Cir.1983); *accord Evans v. Sullivan,* 928 F.2d 109 (4th Cir.1990).

 As explained, the Army's finding was deficient because it focused entirely on the need for the product and services covered by the challenged contract and failed to explain why those circumstances, which are undisputed, made it necessary to override the stay. Although erroneous, the position taken by the Army in the administrative proceedings and in this action respecting the pre-award protest was not so unreasonable as to fail the substantially justified standard of the EAJA.

At the time this action was filed and decided, there were only a handful of cases, reported and unreported, that had addressed the override provisions of CICA. The two reported cases directly addressing the issue of a CICA override, *Universal Shipping Co. v. United States,* 652 F.Supp. 668 (D.D.C. 1987) and *Samson Tug & Barge Co. v. United States,* 695 F.Supp. 25 (D.D.C.1988), dealt with the override of a post-award, not pre-award, stays. Among the unreported cases, there was inconsistency respecting the nature of the findings required to override CICA's automatic stay provision. *Compare Ace Fed. Reporter v. Federal Energy Regulatory Comm'n, supra, with Burnside–Ott Aviation Training Center, Inc. v. Department of the Navy and Ford Aerospace Servs., Inc.,* 35 CCF ¶ 75,586 1988 WL 179796 (D.D.C. Nov. 4, 1988) (in contract involving training Navy pilots on highly technical flight simulators, the court found that "[t]he finding required by CICA to override the automatic stay was that performance of the contract by any contractor was urgent and compelling"). Given the unsettled condition of the decisional law and the fact that some unpublished decisions supported the Army's interpretation of CICA's override provisions, the Army's position respecting

the pre-award stay was substantially justified within the meaning of EAJA.

## 2. The Post–Award Protest

██ Unlike the Army's position on the pre-award protest, the handling of the post-award protest was reasonable neither in law nor fact. Under the express provisions of 31 U.S.C. § 3553(d)(1), once the Army received notice of Dairy Maid's timely post-award protest, it was statutorily required to direct CIC to cease performance unless and until a finding was made pursuant to 31 U.S.C. § 3553(d)(2). The undisputed record shows that the Army neither made the requisite finding, nor directed CIC to cease performance. The Army asserted that it was not required to make a finding under 31 U.S.C. § 3553(d)(2) because it had already made a finding under 31 U.S.C. § 3553(c)(1) when it overrode Dairy Maid's pre-award protest. As discussed above, this position ignored the clear and mandatory language of 31 U.S.C. § 3553(d)(2), which required a second independent finding. The Army's willful failure to comply with mandatory statutory provisions and its dogged adherence to its untenable legal position regarding the requirements of 31 U.S.C. § 3553(d)(2), both at the level of the agency decision and at trial, was unreasonable in law and fact. Recovery of attorney fees and expenses, therefore, is appropriate and the court turns now to the calculation of those fees under the EAJA.

## 3. Calculation of Recoverable Attorney Fees and Expenses

Dairy Maid seeks to recover a total amount of $32,318.81 in attorney fees and expenses. This total consists of: (1) $29,440.03 in attorney fees, including paralegal and legal courier time; (2) $1,378.78 in disbursements; and (3) $1,500.00 in fees to litigate the EAJA application. Notwithstanding the statutory cap on attorney fees of $75.00 per hour, Dairy Maid requests compensation at a higher rate based upon a cost of living adjustment, the complex nature of the case, and the ultimate outcome achieved. The EAJA provides:

The amount of fees awarded under this subsection shall be based upon prevailing market rates for the kind and quality of the services furnished, except that ... attorney fees shall not be awarded in excess of $75 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee.

28 U.S.C. § 2412(d)(2)(A)(ii). Dairy Maid has the burden of proof on these issues. The Army challenges Dairy Maid's calculation of the enhancement of the hourly rate for adjustment of the cost of living, as well as a number of specific billable items.

### a. The Cost of Living Adjustment

██ Enhancement of the statutory $75 per hour rate for increases in the cost of living are expressly recognized by 28 U.S.C. § 2412. The decision to award fees in excess of the statutory cap based on a cost of living adjustment ("COLA") is within the discretion of the district court. See May v. Sullivan, 936 F.2d 176, 178 (4th Cir.1991). The COLA is most frequently calculated by the courts with reference to the Consumer Price Index—Urban ("CPI–U"). See, e.g., Ramon–Sepulveda v. I.N.S., 863 F.2d 1458, 1463 (9th Cir.1988); Allen v. Bowen, 821 F.2d 963, 967 (3d Cir.1987). The United States Court of Appeals for the Fourth Circuit, while not expressly endorsing the CPI–U, has suggested recently that it is an appropriate measure to calculate COLA's for EAJA adjustments. Sullivan v. Sullivan, 958 F.2d 574, 577 at n. 6 (4th Cir.1992).

In this action, Dairy Maid has presented evidence of a significant increase in the cost of living since the EAJA was enacted in 1981. It also has submitted affidavits indicating that $75 per hour is a substantially lower rate than most practitioners in the area are receiving. The Army does not question Dairy Maid's evidence of the need for an adjusted hourly rate. It does contest, however, the CPI–U formula used by Dairy Maid to reach its calculation of an hourly rate of $115.31.[3]

---

**3.** The billing rates for some of Dairy Maid's attorneys were less than $115.31 per hour. The total award of attorney fees to Dairy Maid has been calculated by charging either $115.31 per

Dairy Maid set the date from which the cost of living adjustment was calculated as October 1, 1981, the original effective date of the EAJA. It is the Army's position that, because the EAJA expired in 1984 and was reenacted in 1985, without increasing the $75 per hour limit, the court should measure the cost of living increase from 1985, rather than from 1981.

Although the United States Court of Appeals for the Fourth Circuit has not directly addressed this issue, it recently has quoted with approval *Baker v. Bowen,* 839 F.2d 1075, 1084 (5th Cir.1988), which held that "[b]y permitting cost-of-living increases, Congress intended to provide attorneys at most with *an hourly rate in present-day dollars commensurate with seventy-five dollars in 1981,* but no more." *Sullivan v. Sullivan,* 958 F.2d at 577 (emphasis added). This language, which suggests that the cost of living adjustment is to be calculated from the 1981 date, is in accord with the majority of circuits which have addressed the question. *See Ramon–Sepulveda v. I.N.S.,* 863 F.2d at 1462 (9th Cir.1988) ("Congress, in retaining the $75 cap, did not intend that courts should ignore the inflation that had occurred between 1981 and 1985"); *Trichilo v. Secretary of Health and Human Services,* 823 F.2d 702, 705–07 (2d Cir.1987) (the 1985 Congress "intended the measuring point for inflationary increases in the attorney's fee cap to be October 1, 1981"); *Sierra Club v. Secretary of the Army,* 820 F.2d 513, 520–23 (1st Cir. 1987). The court finds the reasoning of the above cases to be persuasive, and hence concludes that Dairy Maid correctly calculated the COLA enhancement from the October 1, 1981 base point.

### b. Adjustments to Specific Items

First, the Army argues that it was not necessary for Dairy Maid to have two attorneys present at the hearing of its request for an injunction on April 13, 1993, and that the hours for one of them should be deleted from the award. The court believes that the presence of two attorneys at the hearing was justified. The retention of multiple counsel in complex proceedings is "understandable and not a ground for reducing

hours claimed." *Jean v. Nelson,* 863 F.2d 759, 772 (11th Cir.1988), *aff'd sub nom., Commissioner, I.N.S. v. Jean,* 496 U.S. 154, 110 S.Ct. 2316, 110 L.Ed.2d 134 (1990). This litigation required counsel to master significant factual detail and complex legal issues in a very short period of time, and the attorneys for Dairy Maid performed their responsibilities expeditiously and in exemplary fashion. For these reasons, the court finds that it was reasonable for Dairy Maid to have two attorneys at the hearing on Dairy Maid's request for an injunction on April 13, 1993.

The Army also argues that Dairy Maid should not receive fees and disbursements for the hours devoted by its counsel to address pleadings filed by CIC. The court agrees. The Army was not involved in any of the matters filed by CIC, and had no control over what CIC or its attorneys chose to file. Thus, the court orders that those hours which Dairy Maid attorneys spent working on matters raised solely by CIC be excised from the amount requested. Dairy Maid is directed to submit a revised statement of attorneys' fees and disbursements within ten days from the date this order is entered, deleting any attorneys fees or disbursements relating to those matters raised solely by CIC.

That leaves for resolution the extent to which, if any, the fee application must be reduced because of the finding that the Army's position as it respects the pre-award protest was substantially justified within the meaning of the EAJA. Under the facts of this case, the court finds that no adjustment was necessary. First, litigation of the issues respecting the pre-award stay was necessary to securing relief from the override of the post-award stay because of the Army's decision to base its override of the post-award stay on the findings it made to justify the pre-award stay. Second, many of the legal issues were inherently and substantially overlapping and much of the research and the pleadings pertained to both issues. Hence, on this record and considering the issues of this case, there is no need to adjust the claimed fee because of the finding of

hour or the actual rate billed, whichever is lower.

substantial justification on the pre-award stay.

It is so ordered.